Natona Mills, Inc., et al., Appellants, *v.* Pennsylvania Public Utility Commission.

Argued March 29, 1955. Before RHODES, P. J., HIRT, ROSS, GUNTHER, WRIGHT, WOODSIDE, and ERVIN, JJ.

*Arthur Silverblatt,* with him *James, McLean, Silver-blatt & Miner,* for appellants.

*Harris J. Latta, Jr.,* Assistant Counsel, with him *John E. Fullerton,* Assistant Counsel, *Thomas M. Kerrigan,* Acting Counsel, *Jack F. Aschinger,* Assistant Counsel, and *Lloyd S. Benjamin,* Counsel, for appellee.

*Ernest R. von Starck,* with him *Norman T. Hayes, Jr.,* and *Morgan, Lewis & Bockius,* for utility company, intervening appellee.

OPINION BY HIRT, J., September 28, 1955:

Prior to December 31, 1952 United Gas Improvement Company—U.G.I., as we shall refer to it—was a holding company which owned and operated seven subsidiary corporations. Luzerne County Gas & Electric Corporation was one of them, which along with the other six subsidiaries was merged into the body corporate of United Gas Improvement Company on the above date. Thereupon U.G.I. became the general operating company. The merger was accomplished in accordance with the terms of an agreement entered into by all of the merging corporations which had been approved by the Pennsylvania Public Utility Commission on June 16, 1952.

Since the merger the Luzerne Division of U.G.I., in the sale of electric energy serves more than 45,000 customers in Luzerne County. On May 29, 1953, U.G.I.

filed with the Commission Supplement No. 10 to the existing tariff providing for increases and changes in certain of the electric rates applicable to large power users in its Luzerne Division, to become effective on July 28, 1953. This supplement to the tariff prompted an investigation by the Commission, of its own motion, to determine the validity of the proposed increased rates. Ten industrial companies affected by the rates had filed complaints. The complaint proceedings were consolidated with the Commission investigation for hearing and, pending final order, the operation of the rates in the proposed supplement were suspended for successive periods of six and three months to April 28, 1954. Ten days of hearings were held, the last of them on February 3, 1954. The Commission on April 12, 1954 entered a unanimous order in which the complaints were dismissed and the proposed rates of Supplement No. 10 were declared to be fair and reasonable. The order found the "fair value of respondent's property, used and useful in electric public service, to be $19,000,000 as of July 31, 1953." A return of $991,044 at 5.22% on fair value, as found, was allowed. These findings of fair value, and the amount of allowable earnings at the approved rate of return are not questioned in this appeal.

Of the 45,313 customers of the Luzerne Division as of the cut-off date of July 31, 1953, 37,510 were classified as Residential or Domestic, 3,162 as Rural and 4,365, Commercial. The remaining customers were Industrial or miscellaneous public users of the company's service. Under Supplement No. 10 two rate schedules were increased; one, Rate ERP applicable to service of Wilkes-Barre Transit Corporation, not questioned here, and the other a general rate, designated as Rate LP having application exclusively to large power users. The operation of Rate LP will result in a 21.42% in-

crease to 27 customers. The supplement to the schedule otherwise will not work an increase in electric rates to any of the remaining 45,281 customers involved.

The appellants are five of the large power users affected by the new LP Rate. They contend that the imposition of a raise of 21.42% in their rates resulting in an increase upon the group of 27 large power users as a whole of about $238,730 is unfair, unreasonable, and discriminatory in violation of §304 of the Public Utility Code of May 28, 1937, P. L. 1053, 66 PS §1144, and especially so, since $135,317 of that amount was allowed by the Commission as administrative expense which prior to the merger had been absorbed by U.G.I. as the holding company. A second contention is that U.G.I.'s application, as the operating company, for increased rates "five months after the merger" was premature and the increase allowed under Tariff Supplement No. 10 should be set aside on that ground.

Prior to the merger U.G.I. rendered services to its then subsidiaries in relation to accounting, auditing, taxes, records, budgets, reports to State and Federal regulatory authorities, and the like. As a purely holding company U.G.I. was prohibited by law[1] from charging in excess of $2,500 annually to any of its subsidiaries for these services. When this impediment was removed by the merger, U.G.I. continued the services but began to charge expenses to the utility operations for which they were incurred. In addition to administrative costs U.G.I. claimed a net increase of $103,518 in annual electric operating expense of its Luzerne Division. These adjustments were made necessary by in-

---

[1] The Public Utility Holding Company Act of August 26, 1935, c. 687, Title I, 49 Stat. 825; 15 U.S.C. §79m.

creased fuel and labor costs and other increased expenses. None of these items or adjustments is under attack in this appeal. The merger did not result in an increase in the cost of administration. The change was in the allocation of that expense. Based upon the evidence before it the Commission concluded that "$135,317 of Philadelphia Office common expense allocated to Luzerne electric operations annually is reasonable for rate making purposes and that the allocation methods used by respondent produce fair and reasonable results." Appellants do not question the reasonableness of the amount; the charge of discrimination is directed to the allocation of the whole of the above item of common expense to large power users under Tariff Supplement No. 10. Section 304 of the Code provides that "No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service . . ."

It is common knowledge, and there is evidence in this case in the testimony of the Vice-President of U.G.I. in charge of Luzerne Division, that industrial rates in the electric industry are usually established at relatively low levels "so as to encourage that type of business and so that available capacity can be used to the best advantage." But there is no law or usage in the industry which sets up a formula for determining a proper ratio between the rates of large industrial and, for example, domestic or residential users. The charge of discrimination in this case rests largely on an assumption that, except for the allocation of the item of administrative expense to the large power-

users, the rates were substantially in balance between the various classes of rate payers. The assumption has little support in the testimony. However the Commission's inquiry into the validity of the new tariff did comprehend within it the question of discrimination in rates between classes of service. But discrimination in the sense of §304 was only one of the elements involved in the inquiry and if the record does support the conclusion that the new rates are not unreasonably discriminatory against the large power users, it is unimportant that the Commission did not make specific findings in the language of the statute to that effect.

After stating the rate changes contemplated by Supplement No. 10 and, referring to the fact that the Rate LP made changes in existing energy charges only, the Commission in its order stated: "Such a proposed change in rates poses two problems: (a) is the utility, entitled to the overall sought-for increased revenues, and (b) is the utility justified in increasing the rates of the particular schedules in question." The Commission from the evidence found that the utility was entitled to the "overall sought-for increases" measured by 5.22% on fair value of $19,000,000. The Commission then addressed itself to the question whether the new rates of Supplement 10 were justified under the circumstances. After summarily disposing of the proposed increase in the energy charge of Rate ERP, not involved here, the Commission discussed the evidence supporting the increase in Rate LP. This testimony with the exhibits, in our view, met the issue of discrimination now raised by appellants and support a tariff structure with no "unreasonable difference as to rates . . . as between classes of service" in violation of §304, supra. When the Commission found that the new LP rates "would not be excessive" this was the

equivalent of finding, under the circumstances, that the LP rate was not excessive in relation to the rates for other classes of service and the further finding "that respondent is justified in its proposal to increase the charges" in its Rate LP disposes of the charge of discrimination.

A reference to the testimony will demonstrate that the findings of the Commission have ample support in the testimony. The original LP rate of the Luzerne Company had been in effect since 1940 and during the period ending with the present proceedings, there was a marked increase, particularly for that class of service, in the cost of production, with the result that the margin of return over cost was seriously reduced. There is testimony in exhibits on behalf of U.G.I. that since the last revision of its rate structure in 1940 generation costs had increased by more than 100%. Other testimony of a vice-president of U.G.I. is to the effect that it is common practice to include fuel adjustment clauses in tariffs applicable to large power customers and that if a standard fuel clause had been inserted in the LP rate in 1940, the additional revenues which U.G.I. would receive from LP customers in the application of the fuel clause would in itself exceed the amount of the increases of the new rates. Cost studies introduced by U.G.I. indicated that sales to LP customers produced a return of about 3% on the cost of production facilities allocated to the LP service, as compared with an overall return of 5.22% on fair value of U.G.I. property as a whole. Appellants criticise this testimony but on the issue of discrimination it is significant that although the Commission did not agree "with every detail" of the allocation study, it nevertheless accepted it as giving support to the finding "that the proposed energy charges in Rate LP would not be excessive."

The appellants did not offer any testimony at the hearings before the Commission and in the present appeal they rely entirely on their criticism of the case as presented by U.G.I. In our view U.G.I. has met the burden upon it of establishing that the new LP Rate is fair and reasonable and does not subject large power users to "an unreasonable prejudice or disadvantage." The Commission is not chargeable with error of law or with failure to give proper weight to any of the evidence. The findings and the order are supported by the evidence and we are bound by them. *Schuylkill Val. Lines Inc. v. P. U. C. et al.,* 165 Pa. Superior Ct. 393, 68 A. 2d 448; *Duquesne Light Co. v. Pa. P. U. C.,* 176 Pa. Superior Ct. 568, 577, 107 A. 2d 745.

We are unable also, to find merit in the appellants' second contention that U.G.I.'s application for increased rates "five months after the merger" was premature. Appellants argue that no increase in rates should be allowed to stand until economies which U.G.I. asserted would result from the merger have been effected. Of the seven subsidiary companies merged into U.G.I., six were gas companies and only one was an electric company. These are now operation divisions of U.G.I. There was testimony before the Commission that certain economies would result from the merger. The economies referred to in the testimony however related principally to the combined service of the six gas companies. The economies would not materially work a reduction in expense in the operation of the Luzerne Division, the single electric operating unit of U.G.I. The Commission in its order after discussing the question found: "The merger caused no material changes in operating expenses allocable to electric operations other than the items adjusted in this order." In any view, as appellants concede, the question whether the application for increased rates

was premature was "a policy and administrative question which should be decided by the Commission and not by a court and ordinarily is not subject to review." The Commission in deciding the question adversely to the appellants did not act arbitrarily nor did it ignore material credible evidence. The Commission therefore is not chargeable with error in finding that the application for increases in rates was not premature under the circumstances.

Order affirmed.