United States Steel Corporation, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Respondent—Philadelphia Electric Company, Intervenor.

Philadelphia Electric Company, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Respondent—United States Steel Corporation, Intervenor.

196

Argued June 6, 1978, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS, BLATT and DISALLE.

*Henry M. Wick, Jr.,* with him *Charles J. Streiff;* and, of counsel, *Kenneth R. Pepperney;* and *Wick, Vuono & Lavelle,* for United States Steel Corporation.

*Robert H. Young,* with him *Ernest R. vonStarck; Walter R, Hall, II;* and, of counsel, *Edward G. Bauer, Jr.,* General Counsel; and *Morgan, Lewis & Bockius,* for Philadelphia Electric Company.

*Charles F. Hoffman,* Assistant Counsel, with him *Daniel F. Joella,* Assistant Counsel, and *Barnett Satinsky,* Chief Counsel, for Pennsylvania Public Utility Commission.

OPINION BY JUDGE ROGERS, August 9, 1978:

The Philadelphia Electric Company (PECO), a utility which supplies manufactured and natural gas to the public, and the United States Steel Corporation (USS), a PECO customer, have filed petitions for review of a final order of the Pennsylvania Public Utility Commission (Commission) allowing PECO additional annual operating revenues of $9,234,000 and approving PECO's proposal for changes in its customers' rate structure. PECO's petition for review filed to this Court's docket No. 87 C.D. 1977 contests the Commission's failure to allow the full amount of additional annual revenues requested in the amount of $14,044,000. USS's petition at docket No. 69 C.D. 1977 challenges the Commission's approval of PECO's proposed new rate structure which eliminated class TC, which only USS previously occupied, and which placed USS in class L where rates were higher. PECO has intervened in USS's case on appeal for the purpose of defending the new rate structure. We have consolidated the cases for briefing, argument and disposition.

On April 3, 1975 PECO filed Supplements Nos. 35 and 36 to Tariff Gas—Pa. P.U.C. No. 23, to become effective June 2, 1975. By Supplement No. 35 it sought Commission approval of rate increases which would yield additional annual revenues of $6,402,000. By Supplement No. 36 it sought additional annual revenues in the amount of $7,642,000. The test year was that ending December 31, 1974. The proposed annual additions would produce total annual operating revenues of $128,920,000, an approximately 12.2% increase in previously allowed revenues.

Supplements Nos. 35 and 36 also proposed a reorganization and reclassification of rate schedules and increases in gas rates to all except PECO's residential and small commercial customers. Supplement No.

35 proposed to place all of PECO's existing industrial customer classes in a single Rate L. The classes proposed to be joined in class Rate L were: Rate TC, a special rate charged only for direct service to USS from PECO's major gas supplier, Transcontinental Gas Pipeline Corporation (TRANSCO); Rate TE, a special rate charged only for direct service to three large industrial customers from PECO's other pipeline supplier, Texas Eastern Transmission Corporation; and Rate VL, the rate charged to PECO's other large volume industrial customers served through and connected to PECO's own distribution system.

By Supplement No. 36, PECO proposed that existing Rate G, applied to small commercial and residential customers, be divided into new rates GR and GC. Residential customers were to be subject to Rate GR while small commercial customers (those using 70 MCF of gas per month or less) would be transferred to Rate GC. PECO also proposed that existing Rate W, which applied to small industrial and large commercial customers, be eliminated and that customers on that schedule be placed in whichever of Rate GC or new Rate L provided the rate more favorable to the customer.

Supplements Nos. 35 and 36 would increase rates to PECO customers by the following percentages: to USS as a former Rate TC customer by 74.8%; to former Rate TE customers by 60%; to former Rate VL customers by 29.8%; to former Rate W customers by 24.1%; and, to former Rate G commercial customers by 3%. As noted, the Supplements proposed no increase of the rates of residential and small commercial customers.

On May 16, 1975, USS filed a complaint and request for suspension alleging that the rate classification changes and increased rates proposed by Supplements Nos. 35 and 36 were unreasonable, discrimina-

tory and in violation of various provisions of the Public Utility Law,[1] 66 P.S. §1101 et seq. Seven additional complaints were filed.

The Commission took no action to suspend the operation of Supplement No. 35 and the rate increases contained therein became effective by operation of law pursuant to Section 308 of the Law, 66 P.S. §1148. On June 2, 1975, the Commission suspended Supplement No. 36 for six months until December 2, 1975 and instituted an inquiry and investigation, docketed at RID 227, for the purpose of determining the fairness, reasonableness, justness and lawfulness of the rates, charges, rules and regulations and imposition of temporary rates. On November 25, 1975, the Commission suspended the effective date of Supplement No. 36 for an additional three months to March 2, 1976, the end of the maximum nine month statutory suspension period. On February 26, 1976, the rates which became effective June 2, 1975 (calculated to yield an increase in annual revenues of $6,402,000) were fixed as temporary rates, effective March 2, 1976, for a period of 90 days in accordance with Section 310 of the Law, 66 P.S. §1150. The temporary rates effective March 2, 1976 were subsequently extended for 60 days through July 29, 1976, and further extended through November 29, 1976.

After six days of hearings on the rate making issues—held between September 5, 1975 and January 6, 1976—the Commission staff prepared a proposed order which the Commission directed to be served on all parties of record for comment prior to final determination. In its final adjudication dated November 22, 1976, the Commission concluded, among other matters, (1) that the fair value of PECO's property used and useful in public service was $255,000,000, as

---

[1] Act of May 28, 1937, *as amended.*

contrasted to the fair value of $300,000,000 claimed by PECO, and (2) that the fair rate of return on such property was 8.5%, as contrasted to the fair rate of return of 9.62% claimed by PECO. The Commission also disallowed $2,557,000 of annual depreciation expenses claimed by PECO. Based on these and other adjustments, the Commission refused PECO's request for an annual revenue increase of $14,044,000 and ordered PECO to file a tariff Supplement containing rates calculated to produce an annual revenue increase of $9,234,000. The Commission order approved the rate structure changes proposed by PECO in Supplement Nos. 35 and 36 and permitted PECO to file a detailed plan for recoupment of revenues due PECO from the application of the rates allowable to service rendered on and after March 2, 1976.

Although the scope of review provisions of Section 1106 of the Public Utility Law, 66 P.S. §1437 were deleted by Section 20 of the Act of October 7, 1976, P.L. 1057, No. 215, we have held that our scope of review remains the same as it was under Section 1107 and case law thereunder. *Pennsylvania Gas and Water Co. v. Pennsylvania Public Utility Commission*, 33 Pa. Commonwealth Ct. 143, 381 A.2d 996 (1977). Our review is by this standard limited to a determination of whether constitutional rights have been violated, an error of law committed or whether the findings, determinations or order of the Commission are supported by substantial evidence.

## I   APPEAL OF USS—RATE STRUCTURE

USS operates a large steel plant known as the Fairless Works at Morrisville, Pennsylvania. PECO supplies natural gas to the USS plant not by means of its distribution system but from a pipeline owned by TRANSCO through a gate station owned by PECO but serving only the Fairless Works. TRANSCO is

a major supplier of natural gas to PECO's distribution system by means of and through which PECO supplies all of its customers, except USS. USS is by far the largest PECO gas customer. The Rate TC under which it was uniquely served was also uniquely favorable to USS. Rate L, to which it was subjected by the final order of the Commission, increased USS's gas costs substantially.

Sections 301 and 304 of the Public Utility Law, 66 P.S. §§1141, 1144, govern rates. Section 301 provides that:

> Every rate made, demanded or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission. . . .

Section 304 declares that:

> No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service. . . . Nothing herein contained shall be deemed to prohibit the establishment of reasonable zone or group systems, or classifications of rates. . . .

The late Judge HARRY A. KRAMER, for this Court, collected the cases interpreting Section 304 and summarized the law as follows:

> [U]nder Section 304, so long as the classification of customers is reasonable or is founded upon some reasonable basis, a utility may

*charge different rates for different classes of customers. The question of whether the classification utilized by the utility is reasonable is a question of fact to be determined by the finder of the fact, namely the PUC.* See Deitch Co. et al. v. Pennsylvania PUC, 204 Pa. Superior Ct. 102, 203 A.2d 515 (1964). The leading case on classification is Alpha Portland Cement Company v. Public Service Commission, 84 Pa. Superior Ct. 255 (1925). The Pennsylvania Superior Court there held that the *preference to one class of customers was not unreasonable unless it could be proven that it created a prejudice to other customers. . . .*

Our Pennsylvania Superior Court in the case of Carpenter v. Pennsylvania Public Utility Commission, 141 Pa. Superior Ct. 447, 450, 15 A.2d 473, 474 (1940), in a case involving electric utility rates, succinctly set forth the applicable law on the subject of discrimination and unreasonable preferences. It said: 'Both at common law and under our statutes, the discrimination forbidden is one that is unreasonable and without factual basis. Alpha Portland Cement Company v. Public Service Commission, 84 Pa. Superior Ct. 255, 270. In that case, Gawthrop, J., speaking of similar provisions in prior statutes said at page 272 [of 84 Pa. Super.]: "*[The Act] contains no requirement that rates for different classes of service be either uniform or equal, or even equally profitable to the utility. The requirement is merely that rates for one class of service shall not be unreasonably prejudicial and disadvantageous to a patron in any other class of service. Before a rate can be declared unduly preferential and therefore unlawful, it is essential that there be*

*not only an advantage to one, but a resulting injury to another.* Such an injury may arise from collecting from one more than a reasonable rate to him in order to make up for inadequate rates charged to another, or because of a lower rate to one of two patrons who are competitors in business. There must be an advantage to one at the expense of the other." See to the same effect, American Lime and Stone Company v. Public Service Commission, 100 Pa. Superior Ct. 158, 161; Hunter v. Public Service Commission, 110 Pa. Superior Ct. 589, 595, 596, 168 A.2d 540; Reading Coach Company v. Public Service Commission, 125 Pa. Superior Ct. 493, 497, 190 A. 172; Pennsylvania R.R. Company v. Public Utility Commission, 135 Pa. Superior Ct. 5, 18, 4 A.2d 622.'
. . . . We believe this to be sound law on the subject. . . . [In] Deitch Company, et al. v. Pennsylvania PUC, supra, . . . again the Superior Court said, at pages 109-10 Pa. and at page 519, A.2d:

'This section of the statute [Section 304] like its predecessor, does not forbid reasonable classification of service or rates, and what is reasonable under the circumstances is primarily an administrative question for the Commission to decide. . . .

'The question of the reasonableness of rates and the difference between rates in their respective classes is an administrative or factual question wherein the findings of the Commission, if supported by competent evidence, will not be disturbed. . . .' (Emphasis added.)

*Philadelphia Suburban Transportation Co. v. Public Utility Commission*, 3 Pa. Commonwealth Ct. 184, 192-94, 281 A.2d 179, 185 (1971).

The principles applicable to rate structure classifications here particularly pertinent are: (1) that a prior rate schedule is not res judicata on the question of discrimination or reasonableness. *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A.2d 826 (1955), and (2) that mere differences in rates between classes of customers does not establish unreasonable discrimination, *Philadelphia v. Pennsylvania Public Utility Commission,* 162 Pa. Superior Ct. 425, 57 A.2d 613 (1948), and (3) that the agency with the power to fix rates is invested with a "flexible limit of judgment."

USS first says that in approving the consolidation of Rates TC, TE and VL into a single Rate L, the Commission has arbitrarily combined customers of widely diversified gas usage characteristics. We disagree. Section 304 specifically authorizes "reasonable . . . classifications of rates. . . ." Customer classifications and attending rate differences may be justified by a variety of considerations, including:

'[T]he quantity of [service] used, the nature of the use, the time of the use, the pattern of the use, or . . . differences of conditions of service, or cost of service. . . .'

*Philadelphia Suburban Transportation Co. v. Public Utility Commission, supra,* 3 Pa. Commonwealth Ct. at 197, 281 A.2d at 186.

It is uncontested that all of PECO's new Rate L customers are large volume users of gas, USS being only the largest. Customers may be classified on the basis of the quantity of gas used. *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 68, 112 A.2d 826, 836 (1955). The record demonstrates, as we note later, that the consolidation of the various rate schedules was indicated by PECO's cost of service study as a means of equalizing rates

among the various industrials and among industrials and other classes of consumers.

Next USS complains that PECO's new rate structure, approved by the Commission, includes no rate increases to residential and small commercial users and gathers the additional annual revenues allowed PECO by increasing the rates of industrial customers and, to a lesser degree, by rate increases to large commercial customers. USS contends that the burden of additional revenues should fall on all PECO's customers and that the exemption of residential and small commercial users unreasonably prefers them and unreasonably prejudices the Rate L customers. We disagree. A similar argument was made in *Natona Mills, Inc. v. Pennsylvania Public Utility Commission,* 179 Pa. Superior Ct. 263, 116 A.2d 876 (1955), where a rate structure effected a 21.42% rate increase in the rates of a class of customers called LP consisting of twenty-seven large users but made no increase in the rates of the utility's 45,281 general customers. Five of the large users appealed the Commission's approval of this structure, invoking Section 304. The Superior Court noted that:

> [T]here is no law or usage in the industry which sets up a formula for determining a proper ratio between the rates of large industrial and, for example, domestic or residential users. *The charge of discrimination in this case rests largely on an assumption that, except for the allocation of the item of administrative expense to the large power users, the rates were substantially in balance between the various classes of rate payers.* The assumption has little support in the testimony. (Emphasis added.)

*Natona Mills, Inc. v. Pennsylvania Public Utility Commission, supra,* 179 Pa. Superior Ct. at 268-69, 116 A. 2d at 879.

The Superior Court then held that a cost of service study introduced by the public utility provided substantial evidence in support of the Commission's conclusion that the proposed increases in the large users' rates were not excessive:

> Cost studies introduced by [the utility] indicated that sales to LP customers produced a return of about 3% on the cost of production facilities allocated to LP service as compared to an overall [fair rate of] return of 5.22% on fair value of [utility] property as a whole. Appellants criticize this testimony but on the issue of discrimination it is significant that although the Commission did not agree 'with every detail' of the allocation study, it nevertheless accepted it as giving support to the finding 'that the proposed energy charges in Rate LP would not be excessive.'

*Natona Mills, Inc. v. Pennsylvania Public Utility Commission, supra,* 179 Pa. Superior Ct. at 270, 116 A. 2d at 880.

In the present case, the record shows that PECO prepared the proposed Supplements Nos. 35 and 36 rate increases to Rate L customers on the basis of what PECO, the Commission and USS all refer to as a "value of service" analysis. Using this method, PECO looked to the least expensive alternative to gas and determined that it was fuel oil which cost approximately $2.50 for energy equivalent to an MCF of gas which cost $1.74. PECO argued that the average cost of gas to Rate L users under Supplement No. 36 remained less than the cost of alternative fuel oil and that it was therefore entirely reasonable. PECO noted in support of this analysis that the depletion of inexpensive gas supplies and their replacement with more expensive gas had changed high volume sales to large customers from something to

be desired to something at best not to be promoted. PECO also submitted a cost of service study showing a serious condition of imbalance on the rate of return with respect to revenues received from various classes of its customers. The results of the cost of service study are summarized in the following table showing for the test year ending December 31, 1974 the rates of return from classifications General Residential (GR), General Commercial (GC) and L prior to and after imposition of Supplement Nos. 35 and 36 increases:

|  | Prior Rates | Supp. No. 35 | Supp. No. 36 |
|---|---|---|---|
| Rate GR | 6.99% | 6.99% | 6.99% |
| Rate GC | 11.99% | 11.99% | 15.93% |
| Rate L | (6.39%) | (0.77%) | 2.35% |
| Average Return on all Rates | 5.29% | 6.38% | 7.67% |

The table shows that under both prior rates and Supplement No. 35 rates, Rate L produces a negative return. Only under Supplement No. 36 rates does Rate L yield a positive 2.35% return, which is still well below the system average return of 7.67%. The record of the rates per MCF actually charged residential customers and customers in former classes VL, TC and TE joined in new Rate L were and are as follows:

|  | Former Rates | Supplement Nos. 35 & 36 Rates |
|---|---|---|
| Residential Customers | $2.50 per MCF | $2.50 per MCF |
| Former Rate VL | $1.41 per MCF | $1.74 per MCF |
| Former Rate TC & TE | .99 per MCF | $1.74 per MCF |

USS first says that the Commission erred in concluding that PECO's proposed rate structure was reasonable because PECO, in fact, calculated and determined the rate increases to Rate L customers *solely* on the principles of value of service as opposed to a cost of service analysis. It contends that the value of service approach inherently breeds discriminatory

rates because it shows rates rising and falling in accordance with the profitability of such service to the consumer. This, restated, USS says, "[is] simply charging what the traffic will bear." Not so. PECO merely compares USS's cost of gas under its former TC rate of .99¢ per MCF to the cost of $2.50 for a comparable quantity of oil to demonstrate L's charge to USS of $1.74 per MCF was reasonable. Costs of alternative fuels may be considered, along with other factors, in determining the reasonableness of a rate structure. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 392-95, 126 A.2d 777, 785 (1956).

USS next says that the Commission erred in finding that PECO's cost of service study correctly allocated certain production and distribution costs to Rate L customers. Specifically, USS objects to the assignment of costs relating to a gas manufacturing plant and PECO's distribution system to USS and the three Rate TE customers. We are told that PECO's manufactured gas is dispersed only through PECO's distribution system and that since USS and three former Rate TE industrials receive their gas from transmission supply lines, they cannot physically receive any of the more expensive manufactured gas. Therefore the contention is that it should not be charged for any costs associated with PECO's distribution system or manufactured gas. We disagree. The Commission held that:

> After an extensive examination of all available data on record, we are of the opinion that respondent is correct in its allocation of production and distribution costs to the industrial customers. *We agree that the industrials do benefit from this manufactured gas by way of displacement since the reason [PECO] maintains the manufactured gas plant is to supple-*

*ment its natural gas supply and thus reduce the industrial customers curtailment by the amount of the gas produced.* The fact that some of the industrials have direct serve status from respondent's gas supply line has no bearing on this case since these customers are able to take more natural gas from the supply line as a result of [PECO's] manufacturing efforts and, to that extent, reduce their curtailment. (Emphasis added.)

The Commission findings and conclusions on the subject of allocations of cost are supported by competent evidence of record and will not be disturbed.[2]

USS finally appears to say that assuming the Rate L classification to be valid and not discriminatory, it should nevertheless be given a separate rate classification because its volume of gas use far exceeds that of any other Rate L customer[3] and because it receives gas service directly from the TRANSCO transmission supply line. These facts do not require that USS be given a singular rate. A large volume of use of a utility's produce alone does not entitle the customer to a preferred rate. *See Carpenter v. Pennsylvania Public Utility Commission,* 141 Pa. Superior Ct. 440, 15 A.2d 401 (1940).

---

[2] USS also attacks the accuracy of the cost of service study as overestimating the rate base and certain costs allocated to Rate L customers. USS, however, fails to inform us of the effect these alleged miscalculations have on the ultimate rate of return of 2.5% that the cost of service study establishes as PECO's return on Rate L customers under Supplements Nos. 35 and 36. PECO tells us that even if all alleged errors are taken as true, the rate of return for Rate L customers would increase only to 2.84%, a return level still less than half of the system average return of 7.67% under Supplement 35 and 36 rates and still well below the 6.99% rate of return for Rate GR residential customers.

[3] USS claims that in 1974 its average gas usage was more than 87 times the average VL usage and nearly 30 times the average TE usage.

We emphasize that the establishment of a rate structure is an administrative function peculiarly within the expertise of the Commission. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 78 A.2d 35 (1951); *American Lime & Stone Co. v. Public Service Commission,* 100 Pa. Superior Ct. 158 (1930). We repeat that the questions USS raises concerning the reasonableness of rates and the difference between rates are factual questions for the Commission whose findings must be upheld if supported by competent evidence. USS asks us to restore it to its sole membership in former classification Rate TC paying .99¢ for each MCF of gas. After an examination, we believe, of most of the court cases on rate structure, we have found only one in which the court directed the Commission to establish a separate rate for any specific group of consumers. That case is *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission,* 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958). An Army Depot and a number of other consumers received water service through a 10″ main owned by the Army not connected with the utility's distribution system and extending from the Army Depot to the utility's pumping station. In determining the revenues allowable, the Commission took into consideration the utility's system-wide average 34.2% loss of water. The Army contended that Riverton's system-wide loss should not have been considered in setting water rates for it and other customers on its main but that they should have a separate classification with lower rates than those paid by other customers. The Superior Court concluded that the Army and the customers on its main were entitled to a separate and lower rate because the Army's main did not leak and therefore did not contribute to the water loss. It is apparent that USS has not produced any such clear reason why it should

be treated differently from the other customers grouped in Rate L. Nor is there here a lack of evidence supporting the new rate structure which would cause us to remand for further evidence as in *Pittsburgh v. Pennsylvania Public Utility Commission*, 165 Pa. Superior Ct. 519, 69 A.2d 844 (1949), and *Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa. Superior Ct. 46, 112 A.2d 826 (1955).[4]

Being satisfied that the Commission's finding that the rate structure proposed by PECO did not unreasonably prejudice USS and that the rate structure is otherwise lawful, we will not disturb the Commission's order in this regard.

## II PECO's APPEAL—CLAIM FOR AMORTIZATION OF DEPRECIATION DEFICIENCY WITH RESPECT TO RETIRED PLANT

PECO prematurely retired its West Conshohocken manufactured gas plant in four steps beginning in 1965 and ending in 1974. It determined that $5,524,000 of the plant's $11,106,000 original cost remained unrecovered at the time of the plant's retirement. PECO therefore included in its claim for depreciation expense an item of $1,105,000 for amortization which would permit it to recover the asserted $5,524,000 depreciation deficiency over a five year period. The Commission refused to allow this claim and PECO contends that this adjustment was error and caused a confiscation of its property.

For rate case purposes, PECO had depreciated the manufactured gas plant in question by the average

---

[4] USS also attacks the Commission's order on the ground that it differs from a proposed order submitted to the Commission by its staff. The contention is that the Commission may enter an order different from the staff proposed order only if it follows the procedures fixed by statute for modifying its own final orders. This argument is totally without merit.

life, group depreciation method. By this method, specific kinds of plant are grouped according to the Commission's Uniform System of Accounts. The estimated service lives of the individual plant units are then averaged to obtain an average life for the group. Based on this average life, depreciation for the group is then accrued using a straight-line method. Obviously, some members of the group will be retired and their costs subtracted from the depreciable plant base prior to reaching the average service life of the group. The average life, group depreciation method, however, is premised on the theory that these early retirements will be offset by other units in the group attaining service lives beyond the average life of the group. If the prediction of average group life is fairly accurate, the group will have a depreciable base of sufficient size for the number of years needed to recoup the unrecovered cost of the units which were retired early.

PECO contends that the depreciation deficiency which it now wishes to amortize was caused by the early retirement of more members of the plant group than had been anticipated and that the retirement was the result of unforeseen and unforeseeable technological advances and inflated cost conditions. Ordinarily, this problem could be corrected by increasing the allowance for annual depreciation to reflect the reduction of the average service life of the group. In fact, at various times between 1940 and 1972, PECO did reduce the estimated service life of the group from 50 years to 30 years. It says, however, that even these reductions failed sufficiently to compensate for the early retirements in question in this case which were the result of the success of PECO's Liquid Natural Gas (LNG) plant, not certain until 1974. PECO says that until the LNG plant proved successful, there was still a possibility that the full cost of the plant

group could have been recovered through the annual depreciation allowance during the service lives of the remaining plant members. The success of the LNG plant permitted the retirement in 1974 of plant that would have remained essential to PECO's gas operation for many more years had the LNG plant failed. It is PECO's contention that not until these 1974 retirements was there a depreciation deficiency which was unrecoverable by normal depreciation accruals.

The Commission order contains several reasons for its refusal to allow PECO the requested amortization allowance.[5] Its principal objection is summarized in the order as follows:

> [PECO] contends that the alleged deficiencies related to early retirements will not be offset by accruals on plant living longer than average life because [PECO] claims that the gas production operations will be retired by 1978. We have discussed the uncertainty of future gas supplies and its relationship to the retirement of manufactured gas plant earlier in this section. Given this uncertainty, it is our opinion that it is impossible at this time to assign a precise retirement date to the manufactured gas plant. Therefore, [PECO's] contention is, at best, speculative at this time.
>
> . . . .
>
> If, in the future, the manufactured gas plant is retired prematurely, and [PECO] promptly thereafter provides the staff with evidence that this retirement could not reasonably have been foreseen and provided for and that such prop-

---

[5] The Commission's reasons for its refusal to allow this item included several of a technical nature based on the alleged failure of PECO to claim or report the impending deficiency on forms or in the manner required by regulations. It would unduly burden this long opinion to discuss these matters.

erty could not have been provided for by the accumulated provisions of depreciation, we will give the claimed deficiency full consideration at that time.

(R.I.D. No. 227 et al., Commission Order dated November 22, 1976, page 19).

PECO argues that the Commission objection is unrealistic because it ignores the fact that in addition to the plant retirements already mentioned, there is plant with an original cost of $11.8 million scheduled for retirement in 1978. This retirement would reduce the depreciable plant base to $4.6 million producing an annual depreciation accrual of only $150,000. PECO argues that even if the plant scheduled for retirement in 1978 remains in service, it would take 26 years to recover the full investment cost of the plant group. Since this period nearly equals the estimated average service life of the entire plant group, PECO contends that it is unreasonable for the Commission to insist that there is still a possibility that the investment cost of the plant group can be recovered without an amortization allowance at this time.

We believe PECO has misconstrued the intention of the Commission order which does not state that amortization allowances will not be granted in future, but only that it would not be granted on the basis of projected future deficiencies. In so deciding, the Commission followed the law that "[i]t is not proper for a public utility to recover, by way of annual depreciation, deficiencies in accrued depreciation not yet experienced." *Pennsylvania Power and Light Co. v. Pennsylvania Public Utility Commission*, 10 Pa. Commonwealth Ct. 328, 338, 311 A.2d 151, 157 (1973). *See also Penn Sheraton Hotel v. Pennsylvania Public Utility Commission*, 198 Pa. Superior Ct. 618, 184 A. 2d 324 (1962). We believe this principle is especially applicable to plant depreciated by the average life,

group depreciation method. As explained above, this method is premised on the theory that the deficiencies created by early retirements will be recovered by using the rate base of plant remaining in service beyond the average group life. So long as there is the possibility that individual group members may remain in active service long enough to permit the recovery of the full investment cost of the group, the question of whether amortization will be required remains somewhat speculative.

We additionally note that the Commission disagrees with PECO's forecast of additional plant retirements in the near future:

> [PECO] has also claimed an amortization allowance of $1,755,000 which it claims is necessary to recover an anticipated reserve deficiency related to certain manufactured gas plant which [PECO] contends will be retired within three to five years. [PECO's] contention that this manufactured gas plant will be retired in three to five years is based upon [PECO's] forecast that '. . . pipeline gas supplies will have increased and other less expensive sources of manufactured gas will be available.'

> An examination of the record discloses that respondent projects a 13,000 Mcf increase in gas supply from 1977 to 1978. Approximately 75% of the increase is projected to come from increased supplies from [PECO's] largest supplier, Transcontinental Gas Pipe Line Corporation.

> An examination of future estimated gas supplies from the Federal Power Commission and various private sources indicates that [PECO's] estimates of increased gas supply for 1978 may be somewhat optimistic. It is our opinion that any estimate of future gas sup-

plies is at best, highly speculative. In the event that the projected increase from Transcontinental Gas Pipe Line Corporation does not materialize, [PECO] may be forced to retain its manufactured gas plant.

(R.I.D. No. 227, et al., Commission Order dated November 22, 1976, pages 16-17).

In effect, PECO asks us to substitute our judgment for that of the Commission just recorded on the question of the certainty of the early retirement of additional manufactured gas plant. This determination is clearly one within the peculiar competence of the Commission to make and we will not disturb its judgment in this regard.

We are aware that the Commission's order on this subject merely postpones the decision of the issue of whether PECO proved a genuine depreciation deficiency for which it was entitled to an amortization allowance. This subject is argued at length in a brief filed on behalf of the Commission, although it is not mentioned in the Commission's adjudication. Since the issue of the sufficiency of the reserve requirement study's determination of accrued depreciation as evidence of actual depreciation allowed is one apparently of first impression, we believe that we should make some mention of it. The amount of PECO's asserted depreciation deficiency for which it asks an allowance for amortization over five years—$5,524,000—was arrived at by subtracting the amount of the accrued depreciation applicable to the retired gas plants shown on its most recent reserve requirement study from their original cost. The author of the Commission's brief contends that this showing was in substance no different from those made in earlier cases where allowances of increases in annual depreciation allowances were based on a showing only of a deficiency between the book reserve and the current re-

serve requirement study—a proof which was eventually held to be inadequate by reason of the unreliability of book reserves as indicative of the amount of accrued depreciation which would have been considered appropriate and reasonable for rate making purposes. The law is fully explained in *Pennsylvania Power and Light Co. v. Pennsylvania Public Utility Commission*, 10 Pa. Commonwealth Ct. 328, 311 A.2d 151 (1973). That case and the cases there cited hold that a utility seeking an increased annual depreciation allowance by reason of an asserted accrued deficiency must prove that during the period of time in which the deficiency was developed it did not receive sufficient revenue to pay all of its operating expenses plus a fair return on the fair value of its property devoted to the public service. We held in that case therefore that the Commission was within its discretionary authority to reject the utility's claim for an increased annual depreciation in order to recover the asserted deficiency. Judge KRAMER explained the holding in the following language:

The common sense of our holding in this case is realized when one again takes note of two basic principles: (1) a public utility only earns money on its rate base, and (2) it earns no money on its expenses. It necessarily follows that even if a genuine deficiency was being created on the book reserves of PP&L, then each year in which there was an accrued depreciation deficiency, the rate payers may have been paying PP&L a return (or earnings) to which PP&L would not have been entitled if a properly depreciated rate base had been determined. To whatever extent that occurred in any given year, PP&L's earnings were higher than would be permitted under the law. PP&L, in its argument before this Court at-

tempts to minimize this mathematical fact of life; but nowhere can PP&L point to a place in the record which disapproves this possible fact. Whether or not this actually occurred in any given year has not been proven by PP&L on the record in this case.

10 Pa. Commonwealth Ct. at 341-42, 311 A.2d at 159.

PECO points out that it has not used book reserve as the measure of its deficiency but the accrued deficiency found by a reserve requirement study made in accordance with Commission requirements. It pointed out that its book reserves would have shown a much larger deficiency. PECO's thesis is that the accrued depreciation shown by the reserve requirement study is sufficient evidence of the genuineness of the depreciation actually taken and that it, PECO, is entitled to the difference between this figure and its original cost. It says that if the reserve requirement study is reliable for the purposes of determining remaining value and the proper allowance for annual depreciation, it should be held to be sufficiently reliable for the purpose of showing the deficiency in depreciation required to be amortized upon the retirement of the property in order to prevent confiscation.

We leave the decision of this question to the Commission in the first instance.

### III   PECO's Appeal—Rate of Return

PECO contends that the Commission's finding with respect to rate of return is not supported by substantial evidence.

The Commission found that the fair rate of return which PECO should have on the $255,000,000 fair value of its properties was "in a range of 8.45 to 8.63 percent," and settled on the figure 8.5%. As part of the process in making this finding, the Commission

found as the rate of PECO's cost of common equity, 10.1%.[6] PECO says that there is no evidence in the record to support this finding and therefore not substantial evidence supporting the Commission's finding of a fair rate of return of 8.5%.

The only evidence presented at the hearings concerning fair rate of return was the testimony of PECO's expert witness, Mr. Joseph Brennan. Mr. Brennan testified that the facts required a finding of a fair rate of 9.62%. He based this figure upon PECO's capital structure and his view of the cost of capital as follows:

| Type of Capital | Capital Structure | Capital Costs | Component Costs |
|---|---|---|---|
| Long-term Debt | 51.6% | 7.97% | 4.11% |
| Preferred Stock | 13.3 | 7.71 | 1.03 |
| Common Equity | 35.1 | 12.75 | 4.48 |
| | 100.0% | | 9.62% |

---

[6] The Commission's finding was that PECO's cost of common equity was "in the range of 10.00 to 10.50 percent." The figure of 10.1% for the cost of common equity is shown to have been that employed by the following calculations using the Commission's figures:

| | Capital Ratio | Capital Cost Rates | Capital Cost Components |
|---|---|---|---|
| Long-Term Debt | 51% | 7.66% | 3.91% |
| Preferred Stock | 14% | 7.53% | 1.05% |
| Common Equity | 35% | 10-10.5% | 3.49-3.67% |
| Cost of Capital | | | 8.45-8.63% |

The cost of common equity is arrived at as follows: Beginning with the 8.5% found as the rate of return; adding the capital cost components for debt (3.91%) and preferred stock (1.05%), we have a total of 4.96%. Hence, 8.5% less 4.96% equals 3.54%, which, divided by 35% (ratio of common equity to total capital) results in a 10.1% figure for the rate for cost of common equity.

Mr. Brennan's recommended capital structure is that projected for PECO to December 31, 1976. At the end of the test year, December 31, 1974, PECO's capital structure was 51.6% long-term debt, 15% preferred stock and 33.4% common equity. On January 7, 1976, the date of the close of the record, PECO's capital structure was 51% long-term debt, 13.9% preferred stock and 35.1% common equity. The Commission concluded that for purposes of finding a fair rate of return PECO's capital structure should be considered distributed as 51% long-term debt, 14% preferred stock and 35% common equity.

Mr. Brennan's recommended cost rate of long-term debt was his projection of PECO's embedded long-term debt cost rate for December 31, 1976. As of December 31, 1974, the end of the test year, PECO's embedded long-term debt cost rate was 7.26% and on January 7, 1976, that figure had risen to 7.66%. The Commission adopted the 7.66% figure as PECO's long-term debt cost to be used in determining rate of return.

Mr. Brennan's recommended preferred stock cost rate of 7.71% was, again, his projection of PECO's embedded preferred stock cost rate as of December 31, 1976. The embedded preferred stock cost rate was 7.53% both at the end of the test year and on January 7, 1976 when the record was closed. The Commission used the figure of 7.53% in its rate of return finding.

Mr. Brennan recommended a common equity cost of 12.75%. He arrived at this figure by studying PECO's earnings/price ratios and earnings/net proceeds ratios for the period 1973-1975 and by calculating the adjusted earnings/price ratios for two electric utility and two gas distribution utility groups for the same 1973-1975 period for comparison with the financial performance of PECO. Mr. Brennan testified that PECO's earnings/price ratios, adjusted for

a 10% cost of common stock financing, were as follows:

October 1973 ................. 10.9%
October 1974 ................. 13.9%
October 1975 ................. 13.6%

Thus, the average adjusted earnings/price ratio for this period was 12.8%. With respect to PECO's earnings/net proceeds ratios for its four common stock issues during the 1973-1975 period, Mr. Brennan testified that the figures were:

April 1973 .................... 9.8%
September 1973 ............... 10.7%
April 1974 .................... 14.6%
September 1974 ............... 15.0%

These figures result in an average earnings/net proceeds ratio for the period of 12.5%. The adjusted earnings/price ratios for the electric and gas distribution groups studied by Mr. Brennan were:

|  | 1973 | 1974 | October 1975 |
|---|---|---|---|
| Moody's 24 Electrics | 11.4% | 15.0% | 16.2% |
| Seven Barometer Electrics | 10.0 | 13.1 | 14.9 |
| Moody's 10 Gas Distributors | 12.1 | 14.0 | 16.5 |
| Eight Baromter Gas Distributors | 12.3 | 15.3 | 16.8 |

On all of this data, Mr. Brennan concluded that PECO's cost of common equity was 12.75%. This figure was, Mr. Brennan cautioned, the "market-related" cost rate and *not* the return rate for common equity relative to book measure of value. He testified that in order for PECO to maintain the integrity of invested capital and to be in a position to attract capital on a reasonable basis, the return rate for common equity measured at book cost should be between 15.5 and 16 percent. Operating on the assumption that the market price of the stock of a utility should be approximately 1.25 times the book value in order

to accommodate "the vagaries of the market and in recognition of market pressure, selling and issuing expenses and the like," Mr. Brennan fixed PECO's market-related cost of common equity at 12.75%.

The Commission, in its order, carefully outlined all of the data supplied by Mr. Brennan but concluded:

> We have examined the relevant data of the record of these proceedings, and further have reviewed the periodic financial operations' reports submitted to this Commission by respondent since the end of the test year. We find the proper range of cost of respondent's common equity for purposes of this Order, to be in the range of 10.00 to 10.50 percent.

The Commission refers to no evidence in the record supporting this finding and offers no explanation of how it arrived at this figure. The only evidence which might support a finding of the cost of common equity at a figure of 10.1% are the figures for the earnings/net proceeds ratio on PECO's sale of common stock in April 1973 at 9.8% and the 1973 earnings/price ratio of 10.0% for the Seven Barometer Electric Companies. This is not a scintilla. The test year in this case was the year ending December 31, 1974. No figures for any time after December 31, 1973 suggest a cost of common equity of less than 10.7% and in fact, the most recent exceeded 13.6%.[7] As the Superior Court said in *Pittsburgh v. Penn-*

---

[7] PECO's earnings/price ratio for October 1975 was 13.6%. Its earnings/net proceeds ratio for September 1974 was 15%. The earnings/price ratios for October 1975 for the two electric and two gas distribution groups were:

| | |
|---|---|
| Moody's 24 Electrics | 16.2% |
| Seven Barometer Electrics | 14.9 |
| Moody's 10 Gas Distributors | 16.5 |
| Eight Barometer Gas Distributors | 16.8 |

*sylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 392, 126 A.2d 777, 785 (1956) : "Although the Commission, within the limits of the statute, has certain discretionary powers (Philadelphia v. Pennsylvania Public Utility Commission, 164 Pa. Superior Ct. 96, 103, 63 A.2d 391), it is not justified in making any finding as to rate of return to be allowed a utility without substantial and competent evidence presented to support it."

The only argument made in the Commission's brief in support of its finding on cost of common equity seems to be that its finding does not have to be supported by any evidence in the record, substantial or otherwise, because of language found in the case of *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591 (1944). The language relied on is as follows:

> Rates which enable a company to operate successfully, to maintain its financial integrity, to attract capital and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called 'fair value' rate base.

320 U.S. at 605.

> It is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end. The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would

upset the rate order under the Act carries the heavy burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences.

320 U.S. at 602. These statements are not infrequently used for the purpose of minimizing the importance of factual support for the findings of regulatory agencies. In context they have no such meaning. The issue under discussion in *Hope Natural Gas Co., supra,* was not rate of return but the sufficiency of the evidence in support of a finding of the utility's *rate base.* The Supreme Court concluded that there was substantial evidence supporting the Federal Power Commission's finding of the "actual legitimate cost" of the utility's properties. The language quoted from Justice DOUGLAS's opinion was with reference solely to the utility's rate base and was employed to refute the argument that reproduction cost or original cost trended were the only proper means of establishing the rate base. The Supreme Court approved the "actual legitimate cost" method; but it did not hold that "actual legitimate cost" could be established by the agency without, or in disregard of, substantial evidence and it did not hold, as the Commission here argues from the quoted language, that if a rate order seems to the court to be reasonable in the abstract, it must be approved. We repeat that fair rate of return was not the subject discussed in *Hope Natural Gas Co., supra.* Rate of return, not rate base, is the issue here.

While the Commission has not claimed their support, we are not unmindful of statements in the cases: (a) that rate of return is not entirely synonymous with cost of capital, (b) that whether a particular rate will constitute just compensation must be determined by the exercise of a fair and enlightened judgment having regard to all relevant facts and (c) that the fair rate of return is necessarily a variable

depending on many factors. *See Pittsburgh v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 363, 375, 101 A.2d 761, 767 (1954). There is also authority, however, for the proposition that the allowance of a rate of return above the cost of capital must be based on the evidence and supported thereby. *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 71, 112 A.2d 826, 837 (1955). The principles first above mentioned provide some justification perhaps for the Commission's action in finding cost of debt and cost of preferred stock at amounts 0.31% and 0.18%, respectively, less than those suggested as proper by the witness who produced the only hard figures on capital cost; those principles alone do not, we believe, justify the Commission's finding that PECO's cost of common equity was 2.65% less than the figure supported by the record. The second statement of principle—that requiring record support for an allowance of a rate of return above the cost of capital—surely imports the like requirement that an allowance of a rate of return below the cost of capital should also have support in the record. The difference of 2.65% in PECO's cost of common equity created a difference of about one percent in rate of return, or, in dollars, of about 2.5 million in allowable annual revenues.

As we have noted, the Commission's order includes a faithful recording of PECO's evidence concerning cost of capital. The only other matters referred to by the Commission in its order as having been considered are financial operation reports submitted by PECO after the end of the test year. The only such report mentioned with any particularity is one described as "at June 30, 1976" purportedly reporting $1.8 million more revenues than those reported at test year end December 31, 1974. The Commission seems to view this increase in revenues as justifying a lower

rate of return than that supported by PECO at the Commission hearings. It will be recalled that Supplement No. 35 filed in these proceedings designed to produce an additional $6.4 million in revenues was permitted to become effective June 2, 1975 and therefore was in effect for a full year before June 30, 1976. We cannot understand how, in view of the increased allowance as of June 2, 1975, an increase in revenues after the test year in an amount much less than the amount which the Commission believed it had allowed showed that the rate of return based on the test year should be less than the rate which the evidence supported. Furthermore, the Commission used the financial reports in justification of a reduced figure both for cost of common equity and for fair rate of return. In *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 71, 112 A.2d 826, 837 (1955), where the Commission did much the same thing, Judge RHODES commented:

... the reasons given by the commission for an allowance [in rate of return] above the cost of capital, that is, normal risks and uncertainties associated with financing in the capital markets, had entered into the cost of capital as found by the commission. Having once considered these factors affecting capital costs and having made an allowance therefor, the commission could not gratuitously make a further allowance for good measure.

In sum, we feel compelled to return the record to the Commission to make proper findings on the rate of return in conformity with this portion of our opinion.

ORDER

AND Now, this 9th day of August, 1978, the record is returned to the Commission for proper findings

on the rate of return in conformity with our opinion herein on that subject. The Commission may receive such additional evidence as the circumstances require and, upon making proper findings, the Commission may revise and modify its final order as may necessarily follow and require proper tariff or tariffs to be filed producing appropriate annual allowable operating revenues. The Commission's final order to the extent stated is set aside; it is otherwise affirmed.