William Welch et al., Petitioners *v.* Pennsylvania Public Utility Commission, Respondent. Walter W. Cohen, Consumer Advocate et al., Intervenors.

William Welch et al., Petitioners *v.* Pennsylvania Public Utility Commission, Respondent.

Sharon Steel Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. National Fuel Gas Distribution Corporation et al., Intervenors.

Argued March 1, 1983, before President Judge CRUMLISH, JR. and Judges ROGERS, BLATT, WILLIAMS, JR. and DOYLE.

*George M. Schroeck,* with him *Edward A. McQuaid, Howard L. Rubenfield* and *Stephen A. George, Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for petitioners, William Welch et al.

*Stephen A. George,* with him *George M. Schroeck,* and *Howard L. Rubenfield, Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for petitioner, Sharon Steel Corporation.

*Charles F. Hoffman,* Chief Counsel, with him *Allison K. Turner,* Assistant Counsel, *Steven A. McClaren,* Deputy Chief Counsel, and *Albert W. Johnson,* for respondent.

*Philip M. McClelland,* with him *Daniel Clearfield* and *Norman J. Kennard,* for intervenors, Walter W. Cohen, Consumer Advocate et al.

*Michael W. Gang,* with him *W. Russel Hoerner, Morgan, Lewis & Bocius,* and *Heino H. Prahl, Phillips, Lytle, Hitchock, Blain & Huber,* for intervenors, National Fuel Gas Distribution Corporation et al.

OPINION BY JUDGE ROGERS, August 4, 1983:

We have consolidated for argument and disposition the appeals of Sharon Steel Corporation and William Welch from a number of orders[1] of the Pennsylvania Public Utility Commission deciding issues raised by National Fuel Gas Distribution Corporation's (NFG) request for a general rate increase which request was embodied in NFG's Pennsylvania Gas Tariff No. 19 filed November 29, 1979. We have recently decided other issues raised by NFG's Tariff Supplement No. 19, *National Fuel Gas Distribution Corporation v. Pennsylvania Public Utility Commission,* 76 Pa. Commonwealth Ct. 102, 464 A.2d 546 (1983), and we will not repeat our discussion of the

---

[1] Entered, respectively, August 28, 1980, March 17, 1981, and December 18, 1981.

facts and applicable legal principles contained in our opinion in that case. It will suffice at this juncture to note that NFG requested authorization from the Commission to collect from its customers additional annual revenues of approximately $21 million; that the Commission disapproved the proposed rates and instead authorized NFG to increase its annual revenues by approximately $8.5 million which increase was ordered to be allocated equally among NFG's customer classes; that the Commission further ordered NFG to refund to customers some $13 million associated with the purchase of synthetic natural gas produced by the Ashland Oil Company, an unregulated petroleum refiner located in Tonawanda, New York and to submit a plan for the refund to customers of a portion of NFG's profits from off-system gas sales transacted during a specified period in 1979 and 1980; and that the Commission delayed the effective date of the authorized rates until October 4, 1980. In the opinion last cited, we affirmed the Commission's decision no longer to permit NFG's purchase of synthetic natural gas from Ashland Oil Company, but we set aside the Commission's order insofar as it required NFG to refund monies previously expended for Ashland synthetic natural gas and we returned the matter to the Commission for further proceedings intended to clarify the legal and factual basis for that refund order. In addition, we reversed the orders of the Commission insofar as they required NFG to refund profits from off-system gas sales because the revenues from such sales were included in NFG's rates previously approved by the Commission and the Commission did not find that NFG's rates during the specified refund period were unjust or unreasonable, and, finally, we ordered the Commission to reconsider the issue of the effective date of NFG's rates

newly approved in the light of recent authority of this court.

In the appeals *sub judice*, Sharon Steel seeks review of the Commission's determination that the increase in NFG's annual operating revenues be allocated equally among the utility's customer classes. William Welch here raises a number of issues related to the refund of off-system gas sales profits ordered by the Commission and the allowance by the Commission of the inclusion in NFG's rates of a contractual penalty charge to be paid by NFG to Ashland Oil on account of synthetic natural gas purchases now ordered by the Commission not to be consummated. For the reasons we will indicate, our decision in *National Fuel Gas Distribution Corporation v. Pennsylvania Public Utility Commission* requires us to dismiss the Petition of William Welch.

## Appeal of Sharon Steel

As we have indicated, Sharon Steel does not here challenge the amount of NFG's rate increase approved by the Commission but seeks review only of the method adopted by the Commission for the allocation of the increase among NFG's customers. On this subject, the Commission's decision accompanying its August 28, 1980, order contains the following:

> If the revenue increase were allocated in the manner proposed by the Office of Consumer Advocate, the class relationships as they presently exist would be maintained. From our review of the record we believe that it is appropriate, at this time, to maintain those historic relationships. Variable class percentage increases to the customer classes, in order to move class rates of returns closer to the system-wide

rate of return is dependent upon a valid and acceptable cost of service study. The validity and acceptability of a cost of service study involves judgments regarding both the methodology and the demand and other data utilized. While both the Staff and the Respondent are satisfied with the methodology utilized, and we do not agree with the criticisms raised by the Office of Consumer Advocate, from our review of the record we have concerns regarding the accuracy of data which was employed in the study. If data inputs regarding the various customer classes is [sic] inaccurate, the indicated results are inaccurate. Were we to approve an allocation similar to that proposed by the Respondent and the Staff, for the stated purpose of moving class rates of return closer to the system-wide rate of return, we are far from satisfied that that would in fact be the result. For this reason, we conclude that caution dictates that the current relationships be maintained at this time, and until such time as we become satisfied that the data inputs are reasonably accurate.

And, on the basis of this reasoning, the Commission entered the following order:

7. That the increase in operating revenues authorized in this order shall be derived from customer classes on an equal percentage increase basis under base rate revenues on a year-end, future test year, and a June 30, 1980, basis.

Concerning the method by which the proposed and requested increase was to be allocated among its customers, NFG presented, before Administrative Law Judge Michael A. Nemec, testimony and exhibits prepared by Fred S. Duda, an expert witness employed

as a senior consultant with the management firm of Stone & Webster Consultants, Inc. Mr. Duda testified that he and another member of his firm, Russell A. Feingold, had performed a cost of service study intending thereby to reveal as to each customer class the cost to NFG of providing gas service to that class, the revenues received by the utility as a result of the provision of gas service to the class and, from these two quantities, the rate of return to the utility attributable to the class. On the basis of this cost of service study, Mr. Duda proposed that the approved increase in revenues be allocated equally in percentage terms among the rate blocks of the utility's declining block rate structure, considering in the calculation only the non-gas portion of each rate block.[2] This scheme of allocation was appropriate, in the expert's opinion, because the cost of service study indicated some disparity among customer classes in the rates of return to the utility produced by each class and, assertedly, the allocation proposed would, for some classes, ameliorate this disparity. Finally, Mr. Duda proposed the simplification of NFG's rate structure which consisted at the time of hearing of three rate classes (General Service, Heating Service and Large Industrial Service) and which the utility proposed to be modified by the elimination of the Heating Service class so that all customers other than those served pursuant to the Large Industrial Service rate class would be in the General Service rate class.

The proposal for allocation of any increase in revenues proposed by NFG as well as the cost of ser-

_____

[2] A declining block rate structure is one in which the price to a particular customer for a given volumetric unit of gas declines in relation to the total volume of gas purchased by that customer during the billing period.

vice study on which the proposal was predicated were roundly criticized by the other parties to this proceeding. Of the several criticisms that were voiced, there was, with the exception of NFG's witnesses, universal agreement that NFG's cost of service study was flawed by its inclusion for analysis of Sharon Steel in the Industrial Non-heat customer class thereby precluding any comparison of the rate of return to NFG attributable to the gas service provided to Sharon Steel with the rate of return attributable to the service of other customers or other classes of customers. Underlying this criticism is the distinction between rate classes and customer classes. It will be recalled that pursuant to the tariff previously in force, NFG had three rate classes which it sought here to reduce to two. NFG's Large Industrial Service rate class governed the service charges of only one of NFG's customers—Sharon Steel. Mr. Feingold's cost of service study, performed on behalf of NFG, discloses the calculated rate of return attributable to a number of customer classes, not rate classes. This is, apparently, a procedural convention commonly employed, but Sharon Steel is thereby included in the Industrial Non-heat customer classes which also includes, without distinction, one hundred fourteen other customers of NFG.

An expert witness for the Office of Consumer Advocate, Steven W. Ruback, testified that a consequence of the distinction above described between customer classes and rate classes in combination with the fact that Sharon Steel is, by far, NFG's largest customer, accounting for 11% of the utility's total annual operating revenues and more significant in this regard than all of the customers included in five other customer classes included in the cost of service

study, rendered misleading and invalid any conclusion to be drawn from the study on the issue of the proper allocation among customers of any approved increase in revenues. Ruback suggested that the Commission order the performance of a new cost of service study or, in the alternative, that the Commission disregard the cost of service study previously performed and allocate any approved increase in revenues among NFG's customers by allocating to each class of customer a portion of the approved increase equal to the portion of NFG's total annual operating revenues contributed by that class—a so-called "across-the-board" method of allocation.

The Commission's trial staff presented on this issue the testimony of Vernon E. Chandler, an expert in rate structure and rate design, who joined in the criticism of other witnesses related to the failure of NFG's cost of service study to permit the separate examination of the rate of return to the utility attributable to the provision of gas service to Sharon Steel. In addition, Mr. Chandler objected to a fundamental precept of NFG's proposed allocation of any approved increase in revenues—the simplification of NFG's rate classifications and the consequential inclusion of commercial and residential customers in the same General Service rate class. In the view of Mr. Chandler, the inclusion of commercial and residential customers in the same rate class is inherently and fundamentally unfair because a necessary consequence of such inclusion in combination with the utility's generally applicable declining block rate structure (see footnote 2 above; this structure is to be continued under the new rates) would be to charge a lower price to commercial users of a particular gas service than would be charged to similar residential users. In the light of these objections to NFG's cost

of service study and its proposed allocation of any approved increase, Mr. Chandler proposed an alternative allocational scheme which is set forth in Table I below in which is also summarized the evidence presented by the witnesses for the various parties to this proceeding, their proposed allocations, and the basis for their proposals:

| Party Witness(es) | Table I NFG Feingold & Duda | Commission Chandler | OCA Ruback |
|---|---|---|---|
| Proposed allocation: Residential | 63% | 60% | 45% |
| Commercial | 14% | 20% | 15% |
| Industrial (all) | 22.1% | 16% | 29% |
| Sharon Steel | 4.6% | 4% | 11% |
| Basis | Cost of service studies intent to equalize customer class rates of return | Defects in NFG's cost of service study; opposed inclusion of residential customers in same rate class as commercial customers | Defects in NFG's cost of service study; general appropriateness of an across-the-board increase |

Sharon Steel's rate design witness, L. W. Loos, again criticized NFG's cost of service study for its failure to permit the examination of the rate of return to the utility produced by Sharon Steel and further testified that Sharon's rate of return, if revealed, would be disproportionate to that produced by other customers or classes of customers of NFG. Sharon Steel did not itself present a cost of service study nor did it propose a scheme for the allocation of any approved increase other than asserting that

Sharon Steel wished to be allocated no part of any increase.

On the basis of this evidence, the Administrative Law Judge, in his recommended decision dated July 16, 1980, credited a revised cost of service study submitted by NFG shortly before the close of the record which study met, at least facially, the objections of several of the expert witnesses having to do with the separate examination of the rate of return to the utility produced by Sharon Steel. However, the Administrative Law Judge did not recommend that the Commission adopt NFG's proposed allocation of any approved increase, which proposed allocation was, as we have noted, also the subject of criticism. The Administrative Law Judge instead recommended that the Commission adopt the proposed allocation advanced by Vernon Chandler appearing on behalf of the Commission's trial staff.

The Commission, as we indicated at the outset, wrote that it was dissatisfied with all of the data and other evidence introduced in support of the several proposed schemes of allocation intended to alter existing class rate of return relationships and, therefore, that it was impelled to accept the alternative recommendation of the Office of the Consumer Advocate's expert witness and to order that the approved increase in revenues be allocated across-the-board, that is; so as to allocate to each customer class a portion of the approved increase equivalent to that portion of NFG's total revenues contributed by that customer class under the rates previously in force. This scheme of allocation produces as corollary effects the maintenance of customer class relationships with respect to rates of return and the production of a percentage increase in experienced rates equivalent for each customer class (in this case each

customer class experienced an increase in its rates of about 4%).[3]

Sharon Steel argues that the scheme of allocation adopted by the Commission and just described is unsupported by the evidence of record and must be set aside by this court on that account as well as for the asserted failure of the Commission to sufficiently explain the reasons for its decision. These arguments are without merit. As we have explained in some detail, the scheme of allocation finally adopted by the Commission was one of those proposed by the expert witnesses testifying on this issue before the Administrative Law Judge, Steven W. Ruback called by the Office of the Consumer Advocate. Two other allocational paradigms were proffered but each was the subject of criticism and each was predicated on an evidentiary foundation said by expert witnesses to be fundamentally flawed and misleading. It is true that NFG submitted a revised cost of service study thereby meeting some of the criticism previously expressed with respect to the evidentiary foundation of the utility's proposed allocation. However, NFG's proposed allocation remained the subject of criticism for its treatment of residential and commercial customers. It may be for this reason that the Administrative Law Judge credited the revised cost of service study but rejected NFG's proposed allocation. Moreover,

---

[3] This relationship is unexplored in the testimony but can be easily established. If we let "Ra" stand for revenues from one customer class and "$T" stand for the utility's total revenues and "%I" stand for the percentage increase approved, the relationship between the experienced percentage increase in rates and the proportion of the dollar increase allocated to the customer class can be expressed as follows:

$$\frac{Ra \times [\%I \, (\$T)]}{\$T} = Ra \times \%I$$

the revised cost of service study was submitted at a point so near the close of the record below as to render impossible any detailed critique of the study by any of the expert witnesses in the case and, indeed, none of the witnesses other than NFG's expert who identified and introduced the revised study, have commented on this record with respect to the weight that ought to be accorded the revision. On this record, it was entirely reasonable for the Commission to reject those schemes of allocation which attempted to interfere with the existing rate of return relationships among customer classes. As the Commission explained:

> [W]e have concerns regarding the accuracy of the data which was employed in the study. If the data input regarding the various customer classes is inaccurate, the indicated results are inaccurate. Were we to approve an allocation similar to that proposed by [NFG] and the [trial staff], for the purposes of moving class rates of return closer to the system-wide rate of return, we are far from satisfied that that would in fact be the result.

We cannot disagree. And we repeat that the across-the-board allocation recommended by the Office of the Consumer Advocate and adopted by the Commission is expressly intended and designed to treat each customer class equally in the matter of the approved increase. Sharon Steel has been allocated 11.3% of the $8.5 million approved increase, a portion of the increase determined by and equivalent to Sharon Steel's proportional contribution to the utility's total annual revenues. The dollar amount of the increase—$940,473.00—represents a 4% increase in Sharon Steel's gas service expense, the same 4%

increase to be experienced by each of the other customer classes, and approximately the same dollar increase proposed by both NFG and the Commission's trial staff, the only other proposed allocations made a part of this record. In factually similar circumstances involving a utility's cost of service study subjected to criticism by other parties which introduced no study of their own but sought review of the Public Utility Commission's decision to reject the criticized study and the derivative scheme of increased revenue allocation, the Supreme Court of Maine affirmed the Commission's decision to adopt an across-the-board allocation. *Central Maine Power Company v. Public Utilities Commission*, 416 A.2d 1240 (Maine, 1980).

The establishment of a rate structure is an administrative function peculiarly within the expertise of the Commission. *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 47 Pa. Commonwealth Ct. 512, 537, 409 A.2d 446, 458 (1979). The burden of proving the allocation to be unreasonable or discriminatory is on the customers challenging such rates. *Armco, Inc. v. Pennsylvania Public Utility Commission*, 54 Pa. Commonwealth Ct. 542, 548, 422 A.2d 719, 722 (1980). In order to prove discrimination, Sharon Steel must show that NFG "was bent on collecting more than a reasonable rate from [Sharon Steel] . . . for the purpose of supplying a deficiency created by inadequate rates charged other customers." *Park Towne v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 285, 291, 433 A.2d 610, 614 (1981). *See also Alpha Portland Cement Co. v. Public Service Commission*, 84 Pa. Superior Ct. 255 (1925). Sharon Steel brings to our attention no evidence which would support a finding that its rates are so high and that they are subsidizing the inadequate rates of others served by NFG.

In the light of the characteristics of an across-the-board increase discussed above we are at a complete loss to understand how the Commission's order here subject to review, which appears to be an archetype of the nondiscriminatory treatment of utility customers with respect to the allocation of an approved increase, could possibly be the subject of a successful challenge on the basis of discrimination. Indeed, Sharon Steel's appeal appears to challenge not the increase allocation made the subject of the Commission's August 28, 1980, order but the rates of NFG described in its tariff previously in force which rates are not the subject of the Commission's Orders here appealed and which rates were explored substantively in this record only by the cost of service studies performed by NFG.

Finally, for the reasons we have indicated including our reproduction of the Commission's statement of reasons *ipsissimis verbis*, which we find to be completely adequate to permit our appellate review, we reject the petitioner's challenge based on Section 703(e) of the Public Utility Code, 66 Pa. C. S. §703(e). *See Clemmer v. Pennsylvania Public Utility Commission*, 207 Pa. Superior Ct. 388, 393, 217 A.2d 800, 804 (1966) (Section 1005 of the Act of May 28, 1937, which provides, in terms identical to Section 703(e) of the Code, that orders of the Commission must be supported by sufficient findings and statement of reasons is primarily for the benefit of the reviewing court); *City of Philadelphia v. Pennsylvania Public Utility Commission*, 162 Pa. Superior Ct. 425, 429, 57 A.2d 613, 615 (1948) (same).

### Appeal of William Welch

The petitioner William Welch here challenges in three respects the Commission's disposition of NFG's

proposed Tariff Supplement No. 19: (1) that the Commission ought to have required a refund to customers on account of NFG's off-system gas sales consummated before the refund period specified in paragraph six of the Commission's August 28, 1980, order;[4] (2) that the Commission ought to have awarded to Welch's attorneys a reasonable fee and expenses to be paid out of the fund created by the Commission's refund orders related to NFG's off-system sales and Ashland SNG purchases; and (3) that the Commission ought not to have permitted the recovery by NFG of the $ .50 per thousand cubic feet of gas not taken provided by paragraph 4.3 of the 1972 agreement between NFG and Ashland Oil Company.

The disposition of the first two of these challenges has been implicitly effected by our decision in *Na-*

---

[4] Paragraph 2 of the Commission's order adopted December 18, 1981, requires NFG to refund some $13 million to its ratepayers representing the additional costs of Ashland SNG during the GCR-2 period. This aspect of the Commission's decision is challenged in Paragraph 14 of Welch's Petition for Review docketed to No. 2281 C.D. 1980 but this challenge has been apparently abandoned as this ordering paragraph is not referred to in the statement of orders appealed from contained in Welch's written argument presented to this Court. Preserved for review is that portion of the Commission's August 28, 1980, order having to do with the required refund of NFG's off-system gas sales margin. With respect to the December 15, 1981, order, only paragraph 5 having to do with the Commission's allowance of the contractual take-or-pay penalty is expressly presented

We note this procedural detail because many of Welch's discussive arguments appear to be relevant to the Commission's order requiring the refund of SNG purchase costs. We have by our order dated August 4, 1983, returned the matter of the SNG costs refund to the Commission for further proceedings and our decision herein is without prejudice to Welch's right to review, if otherwise appropriate, any challenge to the Commission's action following our order of remand.

*tional Fuel Gas Distribution v. Pennsylvania Public Utility Commission, supra.* We there held that the Commission was not authorized under these circumstances to require any refund of off-system gas sales profits and, of course, it was not error for the Commission to have declined the suggestion of Welch and others that temporally more extensive refunds were appropriate. Similarly, Welch's argument with respect to attorney's fees begins with a premise no longer apposite—that the creation by litigation of a "common fund" equitably entitled counsel to recover from the fund their fees and costs. No such fund remains following our reversal of the Commission's refund orders. Moreover, the letter order of the Commission denying Welch's request for attorney's fees is not here the subject of a Petition for Review and, therefore, the issue of the propriety of that order has not been properly brought before us.

Finally, concerning the $ .50 take-or-pay penalty, we reject Welch's assertion of error. Briefly, Welch contends that payment of the penalty will serve no public purpose and, therefore, that the Commission erred in permitting recovery by NFG of the amounts to be paid. However, it was precisely on account of the availability of the take-or-pay penalty that the Commission determined prospectively to disallow NFG's purchase of Ashland SNG to which purchases NFG was contractually committed by a 1972 agreement with Ashland Oil Company. The Commission did not find that NFG's negotiation and execution of the 1972 agreement was imprudent and, indeed, all of the evidence is to the contrary; that the agreement initially and for much of its life was of great benefit to NFG's Pennsylvania ratepayers. It was for the Commission to judge the relative and attendant risks

and benefits of permitting or disallowing NFG to meet its obligations under the take-or-pay clause and a wealth of evidence and argument was presented on this issue including unrebutted expert opinion that NFG's potential liability for breach of the 1972 agreement would be in the hundreds of millions of dollars. We will affirm the Commission's resolution of this issue.

ORDER IN 2281 C.D. 1980 AND 321 C.D. 1982

AND Now, this 4th day of August, 1983, the Petition for Review of William Welch is hereby:

(1) Dismissed; insofar as it seeks review of paragraph 6 of the order of the Pennsylvania Public Utility Commission dated August 28, 1980;

(2) Dismissed, insofar as it seeks review of the letter order of the Pennsylvania Public Utility Commission dated March 17, 1981; without prejudice to the Petitioner's right to renew his claim for counsel fees and costs following the proceedings required by order of remand dated August 4, 1983;

(3) Dismissed; insofar as it seeks review of paragraph 5 of the order of the Pennsylvania Public Utility Commission dated December 18, 1981.

ORDER IN 2338 C.D. 1980

AND Now, this 4th day of August, 1983, the order of the Pennsylvania Public Utility Commission entered and adopted August 28, 1980, is affirmed insofar as it requires any increase in the rates of the National Fuel Gas Distribution Corporation to be allocated on an equal percentage basis to each of the utility's customer classes.