Sharon Steel Corporation, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued October 4, 1983, before President Judge CRUMLISH, JR., and Judges CRAIG, MACPHAIL, DOYLE and BARRY.

*Stephen A. George, Buchanan, Ingersoll, Rodewald, Kyle & Buerger,* for petitioner.

*Veronica A. Smith,* with her *Albert W. Johnson, Allison K. Turner,* Assistant Counsel, *Steven A. McClaren,* Deputy Chief Counsel, and *Charles F. Hoffman,* Chief Counsel, for respondent.

*Michael W. Gang,* with him *W. Russel Hoerner, Morgan, Lewis & Bockius,* for intervenor, National Fuel Gas Distribution Corporation.

*Daniel Clearfield,* Assistant Consumer Advocate, with him *Walter W. Cohen,* Consumer Advocate, for intervenor, Consumer Advocate.

OPINION BY JUDGE CRAIG, November 21, 1983:

Sharon Steel Corporation (Sharon or the company) appeals from a Public Utility Commission (PUC) opinion and order which (1) granted National Fuel Gas Distribution Corporation (NFG or the utility) a general rate increase of $8,548,115 in annual base-rate operating revenues and (2) adopted a rate structure which neither allocated a portion of the increase to Sharon nor permitted a reduction in then-existing rates for NFG's Large Industrial Service (LIS) class, of which Sharon is the sole member.

We must decide if the PUC's decision not to order a reduction in the LIS class return contribution under NFG'S existing rate structure was in error, as a matter of law, or because unsupported by substantial evidence. *U.S. Steel Corp. v. Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 195, 201, 390 A.2d 849, 853 (1978).

## Factual Background

On June 26, 1981, NFG filed Supplement No. 2 to Tariff Gas-Pa. PUC No. 5, proposing a change in rates, effective August 25, 1981, calculated to produce $12,228,679 in additional annual operating revenues, based upon a level of operations for the twelve months ending February 28, 1981.

In August of 1981, the PUC suspended the proposed tariff supplement until March 25, 1982 and ordered:

1. That an investigation on Commission motion is hereby instituted to determine the lawfulness, justness, and reasonableness of the rates, rules and regulations proposed in Supplement No. 2. . . .

2. That this investigation shall include consideration of the lawfulness, justness, and reasonableness of respondent's [NFG's] *existing* rates, rules and regulations.[1] (Emphasis added.)

Sharon, along with eight others, filed complaints in opposition to the proposed increase and changes in base rates; by its terms, Sharon's complaint was that the rate increase proposed in Supplement No. 2 violated section 1301 of the Pennsylvania Public Utility Code (Code)[2] as being excessive, unjust, and unrea-

---

[1] In *Welch v. Pennsylvania Public Utility Commission*, 76 Pa. Commonwealth Ct. 158, 464 A.2d 568 (1983), we held that existing rates for the LIS class—which Sharon now seeks to reduce—were neither unreasonable nor discriminatory. Our holding there does not have res judicata effect upon Sharon's present appeal, however, because the commission, on its own motion, reopened an investigation into the reasonableness of such rates after Sharon took an appeal from the PUC's decision in *Welch* but before our court rendered its decision in August of 1983.

[2] 66 Pa. C. S. §1301.

sonable. The PUC consolidated all complaints with its own investigation.

After twenty-one days of hearings, the administrative law judge (ALJ) determined that NFG had established a total annual operating revenue requirement of $252,492,367, and recommended that the PUC permit a change in rates calculated to increase total annual operating revenues by $10,709,488.

The PUC, however, concluded, among other things, that NFG had demonstrated only an annual operating revenue requirement of $250,330,994 and a need for additional annual operating revenue of $8,548,115, and, except as modified by its opinion and order, adopted the ALJ's recommended decision otherwise.

### Revenue Determination and Burden of Proof

As quoted above, the PUC's initiating order instituted an investigation *upon commission motion* into the propriety of NFG's existing rates as well as the proposed rates. Sharon maintains that, by virtue of the PUC's motion, NFG had the burden of proving that, not only its proposed rates, but also its existing rates, were just and reasonable under section 1301, because section 315 of the Code provides that "[i]n any proceeding upon the motion of the commission, involving any proposed or existing rate . . . the burden of proof to show that the rate involved is just and reasonable shall be upon the public utility." 66 Pa. C. S. §315(a).

The PUC, however, relying upon the Code's section 332(a),[3] the residuary provision as to burden of proof, and *Zucker v. Pennsylvania Public Utility Commis-*

---

[3] Section 332(a) provides:

*Burden of proof.* —Except as may be otherwise provided in section 315 (relating to burden of proof) or other provisions of this part or other relevant statute, the proponent of a rule or order has the burden of proof.

452

*sion,* 43 Pa. Commonwealth Ct. 207, 401 A.2d 1377 (1979), submits that Sharon had the burden to prove that the existing rates were unjust and unreasonable. We disagree.

By ordering an investigation into the propriety of existing and proposed rates on commission motion, the PUC clearly placed the burden of justifying those rates upon NFG. *Zucker* is inapposite because, in that case, no motion of the commission initiated the proceeding. *Id.* at 209, 401 A.2d at 1379. *See also Brockway Glass Co. v. Pennsylvania Public Utility Commission,* 63 Pa. Commonwealth Ct. 238, 243, 437 A.2d 1067, 1070 (1981) (where *customer-initiated* complaint involves existing rate, burden falls upon customer to prove that charge is no longer reasonable).

On the other hand, we cannot agree with Sharon that NFG failed to satisfy its evidentiary burden. Specifically, Sharon appears to contend that NFG came forward only with evidence to support the need for revenue over amounts currently received under existing rates, thereby ignoring the commission's order to justify its revenue needs at existing rates.

However, the utility, in presenting evidence to justify an increment in revenue of approximately $12.2 million under the proposed rates, put in a case for its *total* revenue requirements, including those which support the existing rates as well. When we scrutinize the evaluation of various trial staff and Office of Consumer Advocate (OCA) challenges to the utility's revenue, rate of return, and operating and maintenance expense data for projected levels of operation, and when we review the PUC's allowance of a significant portion of NFG's request, we observe that this commission proceeding indeed embraced the propriety of present as well as proposed rates. For example, Table I—appended to the PUC's decision—established NFG's rate base at $93,403,175 and NFG's projected

operation and maintenance expense total for Pennsylvania at approximately $217 million dollars.

There is no evidence of record to suggest that Sharon ever challenged the NFG data relating to the Utility's total revenue needs; indeed, in the introduction to his recommended decision, the ALJ observed that "Sharon Steel has limited its participation to rate structure issues."

We conclude that NFG affirmatively met its burden as to the rates overall, as well as to the incremental increase. Substantial evidence, not countered by Sharon, supports that element of the PUC decision.

### Rate Structure

In its original filing to increase annual revenues by approximately $12.2 million, NFG proposed to distribute the increase among its various customer classes as follows:

| | | |
|---|---|---|
| Residential | $ 7,411,812 | 7.1% |
| Commercial/Public Authority | $ 1,828,618 | 4.9% |
| Industrial | $ 2,338,155 | 3.3% |
| Large Industrial (Sharon) | $ 623,508 | 2.8% |
| | $12,202,093 | 5.2% avg. overall Increase |

In support of these proposed allocations, NFG presented cost of service studies which allocated demand-related costs on a three-day peak and average day basis and three-day maximum peak basis; the following tabulation indicates the rate of return and unitized rate of return[4] by customer class, at present and proposed rates:

---

[4] Unitized rates of return in excess of 1.0 indicate a higher than system average rate of return. Unitized rates of return which are less than 1.0 indicate a lower than system average rate of return.

|  | Present | | | | Proposed | | | |
|---|---|---|---|---|---|---|---|---|
|  | Three-Day Peak and Average | | Three-Day Peak | | Three-Day Peak and Average | | Three-Day Peak | |
| Customer Class | Rate of Return | Unitized Rate of Return | Rate of Return | Unitized Rate of Return | Rate of Return | Unitized Rate of Return | Rate of Return | Unitized Rate of Return |
| Residential | 6.25 | 0.70 | 5.73 | 0.64 | 13.13 | 0.84 | 12.32 | 0.78 |
| Commercial/P.A. | 7.48 | 0.83 | 6.64 | 0.74 | 13.45 | 0.86 | 12.26 | 0.78 |
| Industrial | 13.69 | 1.52 | 18.09 | 2.01 | 19.56 | 1.25 | 25.18 | 1.60 |
| Large Industrial | 57.37 | 6.38 | 65.98 | 7.34 | 74.49 | 4.74 | 85.38 | 5.43 |
| Total Company | 8.99 | 1.00 | 8.99 | 1.00 | 15.71 | 1.00 | 15.71 | 1.00 |

In response to NFG's data and class allocation proposals, the OCA recommended that the residential class receive an increase no greater than the overall percentage increase of 5.2% ultimately granted to NFG and recommended that a larger increase be recouped from the industrial class. OCA's witness concurred with NFG that evidence of record justified the increases proposed for the commercial/public authority and LIS classes.

Based upon the results of the cost-of-service study, Sharon argued that (1) the increase proposed for the LIS class was excessive, (2) it should receive no increase, and (3) the PUC should reduce existing rates for the LIS class.

The PUC trial staff concurred generally with NFG's proposal, but recommended that the PUC exempt the LIS class from any increase. Specifically, trial staff witness Vernon E. Chandler, Jr. testified that, (1) under the cost-of-service study, the rate of return from Sharon under proposed rates would be unacceptably high, (2) a very high monthly minimum charge and minimum five-year contract with NFG adequately safeguarded the utility's high risk of serving commercial and industrial customers, (3) the PUC should assign no increase to Sharon, and (4) the effect of exempting the LIS rate class from any increase would be the most reasonable way to achieve the goal of moving the LIS rate closer to the system average rate of return. He rejected, however, Sharon's call for a reduction in the LIS rate.

Thus, as well summarized by the ALJ, each party made the following recommendation:

### Recommended Increases %

| | NFG | OCA | TRIAL STAFF | SHARON |
|---|---|---|---|---|
| Residential | 7.1 | 5.2 | 5.76 | —not quantified |
| Commercial/Public Authority | 4.9 | 4.9 | 5.76 | —not quantified |
| Industrial | 3.3 | 6.15 | 5.76 | —not quantified |
| Large Industrial | 2.8 | 2.8 | —0— | —rollback of present rates [to reflect rate of return at system-wide average] |

The ALJ found that, generally, NFG's proposals—with respect to all but the LIS class—were reasonable, but agreed with the trial staff that the PUC should not increase the LIS rate. Distributing that class' share to the other classes resulted in the following allocation:

### Recommended Increases %

| | |
|---|---|
| Residential | 7.47 |
| Commercial/Public Authority | 5.23 |
| Industrial | 3.63 |
| Large Industrial | —0— |

As the ALJ's summary of testimony reveals, witnesses for all parties but Sharon Steel attempted, in some measure, to justify the reasonableness of Sharon's present return contribution, which was approximately five times the system average, in their discussion of NFG's proposed rate structure. Thus, for example, NFG's witnesses testified that the charges to Sharon under the proposed rates would still be less than the historic price of an equivalent amount of an alternative fuel, No. 6 oil, in NFG's service territory, and that the average margin to be earned by NFG under proposed rates compared favorably with the margins earned by other major Penn-

sylvania gas utilities for similar services. Other witnesses, including Sharon's, disputed the value of such testimony.

Although he made few findings to indicate which portions of the voluminous transcript he found most persuasive, the ALJ apparently settled upon the risk factor of serving large industrial customers as the basis for justifying the disparity in class rates of return here. To arrive at that determination, the ALJ apparently relied upon the testimony of OCA witness Steven R. Ruback, who observed that the risk of (carrying and potentially) losing a customer the size of Sharon, in terms of revenue invested to serve that customer, justified a higher rate of return from the company. Trial staff witness Chandler agreed that there are "higher degrees of risks associated with serving commercial and industrial customers than are associated with serving residential customers" and that, consequently, "the rate of return earned on the capital devoted to serving each class should recognize that higher risk."

The ALJ specifically rejected Sharon's proposal to reduce the LIS rate, stating:

Sharon Steel provides the most radical proposal in recommending that its rates be rolled back. Such an abrupt change would be diametrically opposed to any gradualism which might be achieved for this rate. This proposal is simply not supported by the record *nor does it reflect the risk differential.* . . . (Emphasis added.)

As we noted above, the PUC rejected a portion of NFG's $12,228,679 request for additional revenue and the ALJ's recommendation of $10,709,488 in favor of an $8,548,115 revenue increase. No party, including Sharon, has challenged NFG's right to $8,548,115 in additional revenue; Sharon merely contends that the

burden of paying for this increase, as well as the burden of paying for an indeterminate portion of existing service, should not be borne by the LIS rate class.

As to rate structure, the PUC concluded:

[T]he percentage increases proposed by Respondent for the residential class (7.1%), the commercial and public authorities class (4.9%), and for the industrial class (3.3%) represent a reasonable apportionment among classes of the rate increase herein approved and that the resulting rates will be just and reasonable. *Although we consider the cost of competitive fuel, and rates of other gas utilities are properly considered in determining industrial rates, in this proceeding we find that the return contribution of the LIS customer under proposed rates is excessive. We therefore concur with the conclusion of the ALJ that none of the revenue increase should be assigned to the LIS rate schedule, which will result in a movement of the rate of return for this class towards the overall rate of return.* We concur with the ALJ that the revenue increase herein approved be assigned to each of these classes so as to produce approximately the following increases: residential —7.4%, commercial and public authority— 5.23%, and industrial — 3.63%. (Emphasis added.)

Not questioning the determination that the LIS class return contribution under the proposed rates would have proven excessive, Sharon contends only that the PUC's decision not to direct a reduction in existing rates for the LIS class is (1) in error, as a matter of law, and (2) unsupported by substantial evidence. We disagree.

Specifically, Sharon contends that the PUC's refusal to order a reduction in rates for the LIS class is

contrary to law because the PUC, under section 315 (a), should have required NFG to demonstrate that the existing rate structure, with respect to the LIS class, was just and reasonable. Although we have above agreed with Sharon that NFG had the burden to justify its overall revenue request, we disagree that NFG had the burden to justify its rate structure for the LIS class. By ordering an investigation into NFG's existing rates, the PUC did not institute an investigation into the question of reducing the LIS rate in particular; only Sharon has sought that relief, as the proponent of an order to reduce rates.

The core of Sharon's complaint appears to be that, in violation of 66 Pa. C. S. §1304,[5] the PUC has permitted unreasonable discrimination to occur because the return from LIS service is disproportionate to the return provided by NFG's other customer classes.

The burden of proving rate structure discrimination, however, falls upon the customer challenging those rates, *Park Towne v. Pennsylvania Public Utility Commission*, 61 Pa. Commonwealth Ct. 285, 291, 433 A.2d 610, 614 (1981), and before we can declare a rate unlawfully preferential, Sharon would have to show that NFG "was bent on collecting more than a reasonable rate from [Sharon] . . . for the purpose of supplying a deficiency created by inadequate rates

---

[5] Section 1304 provides, in pertinent part:

No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service.

. . . .

This section does not prohibit the establishment of reasonable zone or group systems, or classifications of rates . . . .

charged other customers." *Id.* *See also* *Welch v. Pennsylvania Public Utility Commission,* 76 Pa. Commonwealth Ct. 171, 464 A.2d 574 (1983). Mere differences in rates between classes of customers does not establish unreasonable discrimination. *U.S. Steel Corp.,* 37 Pa. Commonwealth Ct. at 205, 390 A.2d at 854-55.

Although the PUC did not expressly address Sharon's request for a reduction in rates, it generally adopted the recommendations of the ALJ, who determined that Sharon had not supported its rate reduction proposal with evidence of record. The ALJ properly cast that burden of proof upon Sharon. The records supports his conclusion; the company offered no evidence to show that NFG might be collecting more than reasonable compensation from the LIS rate class to compensate for inadequate rates charged to the utility's other customers. Indeed, in *Welch,* 76 Pa. Commonwealth Ct. at 171, 464 A.2d at 574, where we considered Sharon's claim of discrimination against the existing rates which Sharon now seeks to reduce, we likewise observed that the company brought to our attention "no evidence which would support a finding that its rates are so high and that they are subsidizing the inadequate rates of others served by NFG."[6]

Sharon also contends that there is a lack of substantial evidence to support the PUC's order maintaining the LIS class rate at a level constant with the

---

[6] Difficult to understand is Sharon's contention that, under sections 1308 or 1309 of the Code, the PUC failed to determine a just and reasonable rate for the LIS customer class. Clearly, the PUC determined that Sharon's rates should remain constant and that only the other classes should absorb the $8.5 million revenue increase.

Furthermore, contrary to Sharon's contention, the PUC's order is plainly adequate for purposes of appellate review.

LIS rate in effect before approval of the $8.5 million general rate increase. We disagree.

In rate structure cases, the law invests the PUC with a flexible limit of judgment; what is reasonable under the circumstances is primarily an administrative question for the commission to decide. *U.S. Steel Corp.*, 37 Pa. Commonwealth Ct. at 204-05, 390 A.2d at 854-55. Thus, we will not disturb commission findings on rate structure determinations if the PUC supports its findings by competent evidence. *Id.*

Here, the PUC rejected the cost of competitive fuel and the rates of other gas utilities as justifiable bases for *increasing* the return contribution of the LIS customer class, while concurring with the ALJ's conclusion that Sharon's rates should be held constant, resulting "in a movement of the rate of return for this class towards the overall rate of return." The ALJ, in turn, justified his decision not to reduce the LIS rate on the basis of risk, which we discussed previously, and on the notion that a rate rollback for Sharon would not promote the goal of gradually aligning the LIS return contribution with the system average. Clearly, there was substantial evidence of record to support these determinations. Moreover, Sharon has not been able to cite any legal basis for treating the risk and gradualism criteria as impermissible bases for justifying customer classification and the consequent rate differences.

Recognizing that the establishment of a rate structure is an administrative function peculiarly within the expertise of the commission, *id.* at 211, 390 A.2d at 857, we affirm.

### ORDER

Now, November 21, 1983, the order of the Pennsylvania Public Utility Commission, No. R-811600C004, entered March 26, 1982, is affirmed.