533 A.2d 1108

David M. Barasch, Consumer Advocate, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued September 16, 1987, before President Judge CRUMLISH, JR., and Judges CRAIG, MACPHAIL, BARRY and COLINS.

*Daniel Clearfield,* Assistant Consumer Advocate, with him, *Robert P. Haynes, III,* Assistant Consumer Advocate, *David M. Barasch,* Consumer Advocate, for petitioner.

*Billie E. Ramsey,* Assistant Counsel, with her, *Bohdan R. Pankiw,* Deputy Chief Counsel, *Daniel P. Delaney,* Chief Counsel, for respondent.

*D. Mark Thomas,* with him, *Charles E. Thomas, Thomas & Thomas,* for intervenor, Continental Telephone Company of Pennsylvania.

OPINION BY JUDGE COLINS, November 30, 1987:

This is an appeal from an order of the Pennsylvania Public Utility Commission (Commission) dated February 6, 1986, which authorized a proposed rate increase for Continental Telephone Company of Pa. (Continental). These proceedings began when Continental filed a $1.5 million rate increase request with the Commission on April 30, 1985. The Office of Consumer Advocate of Pennsylvania (OCA) and three Continental ratepayers filed complaints against Continental's proposed rates.

On June 25, 1985, the Commission entered an order that instituted an investigation of Continental's present and proposed rates. OCA filed a motion to consolidate Continental's rate request with an ongoing investigation of its rates and service. The Administrative Law Judge (ALJ MINDLIN), who was presiding over the hearings and charged with preparing the Recommended Decision, denied the motion. This ruling was upheld when the Commission denied OCA's petition for interlocutory review.

Extensive hearings were held after which ALJ MINDLIN, on December 13, 1985, issued his Recommended Decision. After the filing of Exceptions and Reply Exceptions, the Commission entered its Opinion and Order on February 6, 1986. On February 21, 1986, Continental filed its tariffs in compliance with the Commission's order. At the same time, OCA filed a Petition for Clarification and/or Reconsideration of the Order, such Petition being denied by the Commission by Order dated March 10, 1986. OCA immediately filed a Petition for Review with this Court.

OCA's challenge to Continental's proposed rates is two-fold. First, OCA contends that the Commission has allowed Continental to charge certain of its ratepayers higher rates because Continental's Emmaus ratepayers received an exemption from any rate increase. OCA argues that this decision by the Commission to allow

Continental to charge its non-Emmaus ratepayers higher rates as a result of its inadequate service to the Emmaus exchange is unreasonably discriminatory, unjust and unreasonable.

The Commission's decision to exempt Emmaus from any rate increase was based on the "severe service difficulties" that the Commission found to exist in the Emmaus exchange.[1] The Emmaus exchange investigation was a separate rate and service investigation over which Administrative Law Judge KASHI presided. This investigation was resolved by a Joint Petition for Settlement (Settlement) between the parties which was approved by the Commission in an Order entered on January 7, 1986, as corrected on February 6, 1986.[2] OCA contends that Continental, in its compliance filing, interpreted the Commission's order as allowing the company to recover from ratepayers outside of Emmaus, the revenue that temporarily could not be charged to Emmaus ratepayers until its service improved. On February 21, 1986, OCA filed a Petition for Clarification or

---

[1] This testimony was submitted in an Emmaus exchange service investigation concerning the variety of service-related problems experienced by Emmaus customers. These problems included: static and/or cross talk on the lines, dissatisfaction with repair service, delays in receiving a dial tone, delays in completing local or toll calls, disconnection in the middle of conversations, properly dialed calls inappropriately connecting with an operator or with prerecorded announcements, interruption of calls by prerecorded announcements, inability to receive incoming calls, and properly dialed calls failing to make any connection. The testimony of the customers also revealed that there had been several complete outages of phone service in the Emmaus local exchange area.

[2] This Settlement was incorporated by reference in the Order under review. The Settlement did not specify any ratemaking remedy but OCA did agree therein "not to pursue any adjustment to Continental's rates, based on the present allegations of inadequate service in the Emmaus exchange in the company's current rate proceeding."

Reconsideration with the Commission, which sought clarification that the Commission did not intend that customers outside the Emmaus exchange should be charged higher rates because of the Emmaus increase exemption. This petition was denied by the Commission and, consequently, Continental's compliance tariff was approved. OCA now challenges the order as contrary to law and unsupported by substantial evidence.

In response, the Commission contends that the rate structure adopted for Continental was lawful and supported by substantial evidence. More specifically, the Commission maintains that the exemption of the Emmaus exchange from a rate increase was a reasonable preference in rates.

Secondly, OCA contends that the Commission's refusal to eliminate the full amount of ratepayer supplied working capital from Continental's claimed rate base should be reversed as contrary to the law and record evidence. The record contained uncontradicted evidence that ratepayers supplied over $800,000 annually in working capital for use by Continental. OCA argues that these cost-free ratepayer funds were available to Continental to reduce the need for funds required from investors in order to supply service and finance the rate base. The Commission applied the rule of thumb that allows a utility to earn a return on capital supplied by ratepayers and rejected the evidence of record. OCA argues that the Commission's refusal to adopt a rate base adjustment to recognize this source of funds requires reversal. The Commission argues that its adjustments to Continental's rate base that eliminated the claim for cash working capital and the claim for materials and supplies were lawful and supported by substantial evidence.[3]

---

[3] We note that a definitive brief was filed on behalf of intervenor, Continental, supporting the Commission's arguments.

## I. Discrimination in Rates

This Court's scope of review in rate cases is limited to a determination of whether the Commission violated constitutional rights, committed an error of law, or made findings which were not supported by substantial evidence. *Bell Telephone Co. of Pennsylvania v. Pennsylvania Public Utility Commission*, 83 Pa. Commonwealth Ct. 331, 478 A.2d 921 (1984).

The pertinent statutory provisions for purposes of this appeal are Sections 1301[4] and 1304[5] of the Public Utility Code (Code). Section 1301 of the Code mandates that rates are to be just and reasonable. It states in pertinent part:

Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the Commission. . . .

Section 1304 of the Code prohibits discrimination in rates and provides that:

No public utility shall, as to rates, make or grant any unreasonable preference or advantage to any person, corporation, or municipal corporation, or subject any person, corporation, or municipal corporation to any unreasonable prejudice or disadvantage. No public utility shall establish or maintain any unreasonable difference as to rates, either as between localities or as between classes of service. . . .

---

The brief for Continental raises the issue of OCA standing and reiterates the arguments of the Commission. We find Contintental's challenge to OCA standing to be meritless and address all remaining issues raised by Continental and the Commission herein.

[4] 66 Pa. C. S. §1301.

[5] 66 Pa. C. S. §1304.

The burden of proving rate structure discrimination lies with the party challenging those rates, in this case, OCA. *Sharon Steel Corp. v. Pennsylvania Public Utility Commission,* 78 Pa. Commonwealth Ct. 447, 468 A.2d 860 (1983). This Court does not fail to recognize that the reasonableness of rates is an administrative question for the Commission, as it is a matter peculiarly within the Commission's "flexible limit of judgment." *Park Towne v. Pennsylvania Public Utility Commission,* 61 Pa. Commonwealth Ct. 285, 291, 433 A.2d 610, 614 (1981).

It is well-established that mere differences in rates between classes of customers do not establish unreasonable discrimination, *United States Steel Corporation v. Pennsylvania Public Utility Commission,* 37 Pa. Commonwealth Ct. 195, 390 A.2d 849 (1978), and to prove discrimination, OCA must establish that Continental was collecting more than a reasonable rate from the non-Emmaus customers in order to supply a deficiency created by inadequate rates charged other customers. *Park Towne.* We have determined that OCA has carried its burden of proof and remand for Commission clarification of the Order in question to prohibit Continental from charging its non-Emmaus exchange customers unreasonably high rates to compensate for the lack of a rate increase in the Emmaus exchange.

In considering challenges to rates and rate differentials under Sections 1301 and 1304 of the Code, this Court has held that the reasonableness of different rates depends upon the circumstances presented in each case. *Peoples Natural Gas Company v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 512, 409 A.2d 446 (1979). As explained by the Commission in its brief to this Court, rate structure determinations are analogous to dividing up the "bill," or the utility's revenue requirement, among the utility's vari-

ous customers. The Commission goes on to note that the Emmaus exemption was part of its rate structure determination in Continental's base rate proceeding. The Order issued by the Commission which allowed Continental to file tariffs designed to produce revenues of $15,201,408 also directed that it would be unfair to assess any portion of any increase in local exchange rates to customers in the Emmaus exchange.

This Court agrees with that determination since the service provided to Emmaus customers was clearly substandard. However, this Court does take issue with the discriminatory manner in which Continental's non-Emmaus customers are "picking up the tab" while Continental brings the Emmaus service up to par.

It is clear and this Court does not dispute that different rates may be charged to customers which are receiving a different type, grade or class of service. *See Carpenter v. Pennsylvania Public Utility Commission,* 141 Pa. Superior Ct. 447, 15 A.2d 473 (1940).[6] Furthermore, differences in the value of service provided to customers can also be a valid basis for rate differentiation. *See Zucker v. Pennsylvania Public Utility Commission,* 43 Pa. Commonwealth Ct. 207, 401 A.2d 1377 (1979); *United States Steel Corporation.*

However, a close examination of the value of service cases indicates that the differences in rates in each of those cases were based on some above average service received by those charged the higher rates. In *Zucker,* for example, this Court found the value of service analysis acceptable to support a fifty cent monthly charge for *private telephone number listing.*

The case *sub judice* can be readily distinguished from the value of service cases cited by the Commis-

---

[6] Cost based differences in rates are reasonable. In *Carpenter,* evidence of different costs to provide service was the basis for the denial of equal rates to low and high voltage electric customers.

sion. Continental's non-Emmaus customers are receiving no special or exceptional service, but instead, are receiving the standard service they had received previous to Continental's rate proceeding in this matter. They, in effect, are being charged premium rates for standard service due to the Emmaus exemption. This fact becomes more evident upon examination of the consequences of Continental's rate allocation once the Emmaus exchange service is adequate.[7] Once this happens, Continental will be able to increase the Emmaus exchange rates. Having been allocated a set earning capacity by the Commission in its rate proceeding, Continental would lower the non-Emmaus customers rates and increase the Emmaus exchange rates to reflect the correction in inadequacies in service.

It is obvious that the non-Emmaus customers are being charged an unreasonable amount for standard service until the Emmaus exchange is up to par. Once the Emmaus customers are charged rates reflecting adequate service, the non-Emmaus customers would have their "surcharge" removed without any change in the level of service. This Court finds that such an allocation of rates is discriminatory in nature, as it imposes an unreasonably high rate on the non-Emmaus customers due to Continental's failure to maintain adequate service to the Emmaus exchange. Non-Emmaus customers

---

[7] The Commission, in its Order, did not specify a time limit within which Continental must upgrade the Emmaus service. It is questionable whether Continental has been provided an incentive to upgrade this service since it can compensate for a lack of an increase in the Emmaus exchange by charging non-Emmaus customers higher rates. However, this Court does recognize that the Joint Settlement between the parties does provide some incentive to Continental to upgrade service. It provides for the filing of a new complaint alleging inadequate service, should Continental fail to comply with the terms of this Settlement.

should not bear the burden of Continental's inadequate service.

The record in this case is devoid of any evidence or basis to support the premium rate being charged to the non-Emmaus customers for their merely adequate service. We conclude that the Commission lacked substantial evidence upon which to base its rate determination and that the Commission made a decision contrary to the law by allowing Continental to charge unreasonably discriminatory rates to the non-Emmaus customers. Therefore, we must remand this matter to the Commission for clarification of its February 6, 1987 Order, to indicate that Continental may not charge more than a reasonable rate to the non-Emmaus customers while the Emmaus exchange service is being upgraded.[8]

## II. *Working Capital Offset to Rate Base*

The second issue before this Court involves the Commission's decision concerning Continental's cash working capital claim. Included in Continental's final rate base claim were the following items:

| | |
|---|---|
| Telephone Plant In Service | $44,508,023 |
| Telephone Plant Under Construction | 2,218,186 |
| Depreciation Reserve | (13,604,129) |
| Materials and Supplies | 149,440 |
| Working Capital | 116,125 |
| Deferred Income Taxes | (6,061,884) |
| | $27,325,760 |

---

[8] The Commission utilized this remedy to deny Pennsylvania Gas & Water Company's rate increase due to the provision of inadequate service. *Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water*, 74 Pub. Util. Reports 4th 238 (1986). Although the Commission has not adjudicated the Emmaus exchange service to be "inadequate," it has characterized the service difficulties as "severe."

Continental's working capital claim was developed from an analysis of the timing of receipt of revenues versus the payment of obligations. This analysis is known as a lead/lag study and was submitted by Continental pursuant to Commission regulations in this rate proceeding. The study analyzed Continental's receipt of revenues and payment of expenses during 1979.

The Commission, in making its decision on this working capital issue, considered the testimony of Ms. Ann Vaffis, Developer of Continental's lead/lag study. It also took into consideration the testimony of OCA witness Thomas F. Catlin, who recommended four adjustments to Continental's claim in order to correct errors in the lead/lag study. Mr. Catlin recommended a rate base reduction of $618,188, so as to allow for the cash working capital supplied by ratepayers.

Continental took the position that the law of this Commonwealth does not call for or require a negative cash working capital adjustment larger than that amount of cash working capital claimed by the utility. The Commission adopted Continental's position in its Opinion and Order, citing its own recent decision in *Equitable Gas Company* at Docket R-842769.[9] The Commission refused to adopt a negative cash working capital determination and instead, decided to eliminate Continental's $116,125 cash working capital claim in addition to Continental's $149,440 materials and supplies claim, thereby applying a zero based working capital allowance.

As we have noted previously, this Court's scope of review in rate cases is limited to a determination of

---

[9] On appeal to this Court, we concluded that the Commission did not commit an error of law by its refusal to adopt a new policy of negative cash working capital. *See Barasch v. Pennsylvania Public Utility Commission,* 108 Pa. Commonwealth Ct. 326, 530 A.2d 936 (1987).

whether the Commission violated constitutional rights, committed an error of law, or made findings which are not supported by substantial evidence. *Bell Telephone.*

The Code provides no guidance on this issue. However, an analysis of the case law arising under the Code indicates that adoption of a negative allowance is not required.

In *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 370 Pa. 305, 88 A.2d 59 (1952), the Pennsylvania Supreme Court held that an adjustment to a utility's cash working capital claim is required to the extent that the customers are providing revenues before the utility pays its cost. The Supreme Court did not, however, find that a rate base adjustment above and beyond the working capital claim, *i.e.,* a negative adjustment, was required. The Supreme Court remanded the case to the Commission for a redetermination of the working capital claim but did not indicate that a negative allowance would be appropriate. Instead, the Supreme Court spoke only in terms of merely eliminating the claim.

The Commission has not failed to recognize that *City of Pittsburgh* requires the recognition of ratepayer supplied capital. The Commission submits that its Opinion and Order under review afforded recognition to ratepayer supplied capital. The true question before this Court is the extent of the adjustment that is required by law upon such recognition. The Commission contends that *City of Pittsburgh* does not stand for the proposition that a utility's rate base must be adjusted downward in excess of the utility's claim for working capital. We agree.

The Commission, in its Opinion and Order, discussed this issue as set forth below:

> The Company's failure to specifically oppose any of OCA's proposed adjustments makes it unnec-

essary for us to address each one individually. Almost any combination of them would suffice to reduce the Company's claim to zero. Therefore the present question is whether we should adopt a *negative* working capital allowance.

In our Opinion and Order in the *Equitable* proceeding we said:

We have not, at least in recent memory, adopted a negative cash working capital. The record in this proceeding is not sufficiently developed regarding the appropriateness of a negative cash working capital determination. None of the parties have cited precedent from other jurisdictions on this subject. While we are *not* in agreement with Equitable regarding its constitutional claim, we are not prepared at this time to adopt a negative cash working capital determination. Consequently, we shall provide for a zero allowance.

(*Id.*, pp. 19-20). Although the parties have addressed this subject at greater length than was the case in the *Equitable* proceeding, we have difficulty with the concept of a negative working capital allowance, and are not yet prepared to take such action.

Therefore, we deny OCA's exception and adopt a zero working capital allowance.

This Court recognizes that the Commission has wide discretion under the law in resolving utility rate base claims. *Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water Company*, 492 Pa. 326, 424 A.2d 1213 (1980), *cert. denied*, 454 U.S. 824 (1981); *UGI Corporation v. Pennsylvania Public Utility Commission*, 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980).

We conclude that OCA has not established an error of law in the Commission's rate base adjustment. We

also conclude that OCA's contention that the Commission's adjustment was contrary to uncontested record evidence is without merit. The Commission adjusted Continental's rate base according to Continental's claim for working capital and claim for materials and supplies. The Commission's decision is clearly supported by substantial evidence in the record. We must emphasize that there is nothing in the Code nor Pennsylvania case law which *requires* that the negative adjustment advocated by OCA be adopted by the Commission. Therefore, we must affirm the decision of the Commission to apply a zero based allowance.

## CONCLUSION

Having determined that that portion of the Commission's Order which exempted the Emmaus exchange customers from a rate increase has resulted in unreasonably discriminatory rates being charged to the non-Emmaus customers, we must reverse that portion of the decision and remand to the Commission for proceedings consistent with this opinion. We affirm that portion of the Commission's decision concerning the zero based cash working capital allowance.

## ORDER

AND NOW, this 30th day of November, 1987, the February 6, 1986 Opinion and Order of the Pennsylvania Public Utility Commission is reversed as to that portion which provides for a rate increase to Continental's non-Emmaus customers to offset the rate increase exemption afforded the Emmaus exchange. We remand to the Commission for clarification of its Order to reflect that Continental may not charge non-Emmaus customers unreasonably high rates to offset the Emmaus exchange exemption.

We affirm that portion of the Commission's Order which implemented a zero based cash working capital allowance in Continental's rate structure.

Jurisdiction relinquished.

Judge PALLADINO did not participate in the decision in this case.